86 A.3d 795

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Leroy FEARS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Feb. 11, 2011.

Decided Feb. 19, 2014.

452

Victor J. Abreu, Jr., Federal Public Defender's Office, for Leroy Fears.

Rushen R. Petit, Rebecca Denean Spangler, Michael Wayne Streily, Allegheny County District Attorney's Office, Amy

Zapp, PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## OPINION

Justice EAKIN.

Leroy Fears appeals from the order denying him collateral relief from his criminal convictions and death sentence, pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–46. We affirm.

Appellant pled guilty to first degree murder, corruption of minors, abuse of a corpse, and two counts of involuntary deviate sexual intercourse (IDSI) relating to the sexual assault and death of a 12–year–old victim.[1] Pursuant to a court-ordered pre-sentence investigation, Christine Martone, M.D.[2] interviewed appellant and diagnosed him with pedophilia. At the penalty phase, appellant waived a jury. Dr. Martone testified on appellant's behalf that during the incident, appellant was overtaken with a sexual urge, acted upon that urge, and when the victim threatened to report what appellant had done, appellant panicked and ultimately killed the victim. Dr. Martone opined appellant's sexual impulse and subsequent panic impaired his judgment. She also stated appellant's alcohol consumption may have further impacted his judgment and impulse control. See N.T. Sentencing, 2/2/95, at 114–16. Appellant offered evidence indicating he had no disciplinary issues during his incarceration. Appellant also introduced his pre-sentence report and a letter from his former roommate, a Japanese exchange student who had known him for years. Obtaining this letter required trial counsel to contact the

1. We fully set forth the underlying facts in appellant's direct appeal. *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 56–58 (2003).

2. Dr. Martone was the chief psychiatrist of the Allegheny County Behavioral Clinic at the time appellant was on trial. The trial court instructed her to interview appellant, and trial counsel used her as an expert witness during the penalty phase.

United States Consulate and have the letter notarized by a consulate officer. *Id.,* at 145–46.

The trial court found one aggravating circumstance: the killing was committed in perpetration of a felony, specifically IDSI. 42 Pa.C.S. § 9711(d)(6). The court also determined appellant had proven the catch-all mitigating circumstance of evidence concerning his character, record, and circumstances of the offense. *Id.,* § 9711(e)(8). The court held the aggravator outweighed the mitigator, and imposed a death sentence for the murder and terms of incarceration for some of the related offenses. Though trial counsel failed to file a direct appeal on appellant's behalf, appellate rights were reinstated, new counsel was appointed, and an evidentiary hearing was held on appellant's claims of trial counsel's ineffectiveness.

On direct appeal, appellant raised numerous ineffectiveness claims. *Fears,* at 59–60. Notwithstanding the general rule established in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), holding defendants "should wait to raise claims of ineffective assistance of trial counsel until collateral review[,]" *id.,* at 738, this Court found review of several of the ineffectiveness claims was appropriate since trial counsel had testified at an evidentiary hearing, and the trial court had addressed these allegations in its opinion. *Fears,* at 59 (citing *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003)).[3] This Court reviewed those claims that were fully litigated below, and dismissed without prejudice those not ripe for review. *Fears,* at 59 & n. 7, 69, 71. We ultimately affirmed on direct appeal. *Id.,* at 74.

Appellant's current counsel filed a motion for stay of execution and other related filings in the United States District Court for the Western District of Pennsylvania.[4] Appellant, through a fellow inmate, then filed a motion for stay of execution in the trial court. Appellant filed a *pro se* PCRA petition, and current counsel thereafter filed an amended

3. The *Bomar* exception was subsequently limited by this Court in *Commonwealth v. Holmes,* 621 Pa. 595, 79 A.3d 562 (2013).

4. Federal proceedings have been stayed pending disposition of appellant's PCRA proceedings.

PCRA petition. The PCRA court[5] dismissed appellant's amended PCRA petition; however, the PCRA court did not file the required notice of intent to dismiss pursuant to Pa.R.Crim.P. 909(B)(2)(a), and we remanded this matter to the PCRA court. *Commonwealth v. Fears,* 596 Pa. 579, 947 A.2d 710 (2008) (*per curiam*). The PCRA court then issued an opinion and notice of intent to dismiss the PCRA petition; the court subsequently denied relief without an evidentiary hearing. Appellant appealed to this Court.

Appellant raises the following claims, which have been summarized and reordered for ease of discussion[6]: (1) whether appellate counsel was ineffective for failing to litigate a diminished capacity defense; (2) whether appellant was able to make knowing, voluntary, and intelligent waivers; (3) whether appellant validly pled guilty to IDSI; (4) whether appellate counsel was ineffective for failing to litigate trial counsel's investigation and presentation of mitigating evidence; (5) whether the Eighth Amendment prohibits the execution of the chronically mentally ill; (6) whether appellant validly waived a penalty phase jury;[7] (7) whether the prosecutor committed misconduct in his penalty phase closing argument; (8) whether appellate counsel ineffectively litigated a challenge to the constitutionality of the aggravating circumstance; (9) whether appellate counsel was ineffective in litigating a challenge to victim impact evidence; (10) whether this Court improperly created a new rule on direct appeal; (11)

5. As the trial judge had been appointed to the United States District Court for the Western District of Pennsylvania, another judge presided over appellant's PCRA proceedings.

6. Appellant is represented in this state collateral appeal by federal lawyers from the Philadelphia-based Federal Community Defender Office, who requested and were granted four extensions to file appellant's brief. When the brief was finally filed nine months after it was originally due, it listed 13 principal claims, exceeded the maximum 100–page limit, and contained 120 footnotes. Additionally, it did not include a substantive statement of the case.

7. While issues six and two could be disposed of concurrently because they are both challenges to the validity of appellant's waivers, appellant presents discrete arguments for each, lending themselves to being disposed of separately.

whether we violated appellant's due process rights by not performing proportionality review on direct appeal; (12) whether the PCRA court erred in denying an evidentiary hearing; and (13) whether the cumulative effect of any errors found entitles appellant to relief.[8]

In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination "is supported by the record and free of legal error." *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 223 (2007) (citations omitted). To be entitled to PCRA relief, appellant must establish, by a preponderance of the evidence, his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2), his claims have "not been previously litigated or waived[,]" and "the failure to litigate the issue prior to or during trial, ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.*, § 9543(a)(3)-(4). An issue is previously litigated if "the highest appellate court in which [appellant] could have had review as a matter of right has ruled on the merits of the issue[.]" *Id.*, § 9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state post[-]conviction proceeding." *Id.*, § 9544(b).

"[C]ounsel is presumed effective, and [appellant] bears the burden of proving otherwise." *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 796 (2008) (citing *Common-*

8. When reviewing appellant's ineffectiveness assertions, given that appellate counsel raised many claims of trial counsel ineffectiveness on direct appeal, the only viable claims before us are ones challenging the effectiveness of appellate counsel's performance in identifying and pursuing claims post-verdict and on direct appeal. Newly-alleged ineffectiveness claims of trial counsel are pertinent only insofar as they prove that appellate counsel was ineffective; therefore, we must focus appellant's layered ineffectiveness claims only upon appellate counsel's actions. *See Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1022 (2003) (citation omitted) (defendant can only prevail if he establishes counsel initially litigating collateral claims of trial counsel ineffectiveness himself performed below constitutional standards).

*wealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 200–01 (1997)). To prevail on an ineffectiveness claim, appellant must establish:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) [appellant] suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.

*Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 373–74 (2011) (citing *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987)).[9] Failure to prove any prong of this test will defeat an ineffectiveness claim. *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000) (citation omitted). "[I]f a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first." *Lesko,* at 374 (citations omitted). When an appellant fails to meaningfully discuss each of the three ineffectiveness prongs, "he is not entitled to relief, and we are constrained to find such claims waived for lack of development." *Steele,* at 797; *see also Commonwealth v. Walter,* 600 Pa. 392, 966 A.2d 560, 566 (2009) (citation omitted).[10] Further, counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 603 (2007) (citations omitted).

**9.** This test is coextensive with the "performance and prejudice" test first enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and recognized in *Pierce* as the proper test under the Pennsylvania Constitution.

**10.** Appellant attempts to overcome any procedural default by arguing "international treaty obligations foreclose the application of any state procedural rule as a basis to deny substantive review of an alleged federal constitutional violation in a death penalty case." Appellant's Brief, at 11 (footnote omitted). The United States Supreme Court held that while one of the International Court of Justice decisions cited by appellant "creates an international law obligation on the part of the United States, it does not of its own force constitute binding federal law that pre-empts state [procedural] restrictions[.]" *Medellin v. Texas,* 552 U.S. 491, 128 S.Ct. 1346, 1367, 170 L.Ed.2d 190 (2008); *see also Commonwealth v. Judge,* 591 Pa. 126, 916 A.2d 511, 524–27 (2007) (rejecting argument that this Court is bound by international treaty obligations). Accordingly, any procedural default on appellant's behalf may constitute waiver.

## I. Guilty Plea

### A. Diminished Capacity Defense [11]

 Appellant, based on his proffer of mental infirmity, developed further in his mitigation claim, *see infra* Part II.A, argues he suffered from a diminished capacity which prevented him from forming the specific intent to kill. Furthermore, he claims his use of alcohol on the day of the murder negated any specific intent to kill. Finally, he contends trial counsel was ineffective for failing to investigate and present a diminished capacity defense. Appellant admits appellate counsel raised this issue on direct appeal, but he argues appellate counsel should have presented expert testimony to support a diminished capacity defense. Further, appellant contends appellate counsel failed to develop Dr. Martone's opinion as to his inability to form the specific intent to kill.

The Commonwealth argues this claim was previously litigated on direct appeal.[12] As to the merits, it alleges appellant cannot prove he suffered from diminished capacity, as his panic was a result of the victim stating he was going to tell his parents, not any mental disorder. The Commonwealth notes appellant denied he was intoxicated. The Commonwealth contends trial counsel had a reasonable basis for not raising a diminished capacity defense, because of appellant's guilty plea to first degree murder, and Dr. Martone had indicated appellant did not suffer from any mental illness. The Commonwealth also suggests appellate counsel was not ineffective for using an expert other than Dr. Martone.

 While the PCRA court found appellant's diminished capacity claims were not previously litigated, it found these claims waived because appellant's ineffectiveness claim was

---

11. "A diminished capacity defense requires that a defendant establish he had a mental defect at the time of a murder that affected his cognitive abilities of deliberation and premeditation necessary to formulate specific intent to kill." *Rainey,* at 237 (citation omitted).

12. The Commonwealth also asserts this claim is moot because appellant pled guilty; however, the Commonwealth fails to present any further argument to this point. This deficiency is of no moment based on our disposition of the issue.

merely boilerplate. When confronted with a defective PCRA petition, the court "shall order amendment of the petition, indicate the nature of the defects, and specify the time within which an amended petition shall be filed." Pa.R.Crim.P. 905(B). Although the PCRA court did not order amendment of the petition, the PCRA court did offer an alternative basis for rejecting this claim—the diminished capacity defense was not available because appellant did not contest his degree of guilt. We need not remand for the filing of a curative petition if such remand would be futile. *See McGill*, at 1026 (finding remand to PCRA court not necessary where remand would be futile). As we ultimately find appellant's claim is meritless, remand would be futile, and is therefore unnecessary.

Appellant argues his claims are not previously litigated because they do not solely rely on " 'previously litigated evidence.' " Appellant's Brief, at 10 (quoting *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 602 n. 9 (2000)). The Commonwealth responds that previously litigated claims cannot be relitigated, even under different theories or allegations. Appellee's Brief, at 17 (quoting *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 570 (2005)).

Although the PCRA court did not find this argument previously litigated—and we do not disagree—appellant cannot show appellate counsel acted unreasonably. Contrary to appellant's assertions, appellate counsel's performance, as evinced in appellant's direct appeal briefs and evidentiary hearing transcripts, was more than adequate. Counsel's briefs asserted trial counsel should have forced appellant to submit to psychiatric evaluation prior to the entry of his guilty plea to first degree murder. Appellate counsel supported her assertions by questioning trial counsel as to why he did not explore expert evaluation before advising appellant on a plea, especially due to the underlying mental "red flags" raised when the circumstances suggested appellant had engaged in sexual acts with a corpse. Appellate counsel developed expert testimony as to diminished capacity at the evidentiary hearing on trial counsel's ineffectiveness, as Ralph E. Tarter, Ph.D. opined appellant "was functioning under extreme diminished

capacity." N.T. PCRA Hearing, 6/27–28/00, at 225. Further, as Dr. Martone had opined appellant only suffered from pedophilia, *see* Report of Christine Martone, M.D., 12/15/94, at 3–4, it was not unreasonable for appellate counsel to seek out another expert. Appellate counsel's claims, which were presented and ultimately rejected on direct appeal, developed sufficient and adequate claims of trial counsel's ineffectiveness for failing to explore a diminished capacity defense.[13] Merely because appellate counsel could have presented more or different experts does not prove she acted unreasonably. As appellant has failed to prove appellate counsel lacked a reasonable basis in litigating this claim, appellant's claim of counsel's ineffectiveness is meritless, and he is not entitled to relief on this claim.[14]

### B. Appellant's Ability to Plead Guilty and Waive His Penalty Phase Jury

In his mitigation claim, *see infra* Part II.A, appellant claims his mental problems prevented him from making a knowing, voluntary, and intelligent guilty plea and waiver of a jury at his penalty phase. He further contends trial counsel and the trial court should have inquired into his ability to make such waivers. Appellant also argues appellate counsel was ineffective because, had appellate counsel further investigated Dr. Martone's and Dr. Tarter's diagnoses, trial counsel's ineffectiveness would have been apparent. Appellant asserts appellate counsel had no strategic reason for failing to properly present this claim, and exploiting the mental health evidence trial counsel failed to highlight would have resulted in appellant being awarded a new trial. The Commonwealth argues the trial court found appellant's waivers were knowing, voluntary, and intelligent, appellant denied suicidal ideation,

13. The relative brevity of our analysis on direct appeal did not reflect upon the performance of counsel in raising and developing the issue. *See Fears,* at 64 n. 11 (ultimately concluding appellant's claim lacked arguable merit and appellant had opportunity to make reasoned decision).

14. Furthermore, we find the prejudice prong of appellant's ineffectiveness claim fails for lack of development. *See Walter,* at 566 (citation omitted).

and it is typical for an imprisoned defendant to be depressed. The PCRA court found this claim was previously litigated and further concluded appellant's pleas were knowing, voluntary, and intelligent.[15]

 Insofar as appellant alleges the trial court erred in accepting his guilty plea, his claim fails because it was litigated on direct appeal. *Fears*, at 63–66; *see* 42 Pa.C.S. § 9544(a)(2). Thus, only appellant's ineffectiveness claim is cognizable. *See Collins*, at 573. Even though appellant raised an ineffectiveness claim in relation to the voluntariness of his pleas on direct appeal, the PCRA court erred in finding his claim of appellate counsel's ineffectiveness previously litigated, as the direct appeal decision focused solely on trial counsel's actions rather than appellate counsel's. Regardless, appellant fails to show he was prejudiced by appellate counsel's presentation regarding trial counsel's investigation into appellant's mental ability to enter a guilty plea and waive his penalty phase jury. We have held:

> Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused appellant to enter an involuntary or unknowing plea. In determining whether a guilty plea was entered knowingly and intelligently, a reviewing court must review all of the circumstances surrounding the entry of that plea.

*Commonwealth v. Allen*, 557 Pa. 135, 732 A.2d 582, 587 (1999) (internal citations omitted). To prove prejudice, appellant must prove "he would not have pled guilty and would have achieved a better outcome at trial." *Commonwealth v. Mallory*, 596 Pa. 172, 941 A.2d 686, 703 (2008) (emphasis omitted). Appellate counsel posited 12 factors to be considered in conducting our inquiry into the voluntariness of appellant's guilty plea, eight of which specifically focused on trial counsel's

15. Appellant argues the PCRA court never discussed this claim; however, in his PCRA petition, it was raised as a sub-claim of his challenge to the voluntariness of his waiver and guilty plea. In finding his plea knowing, voluntary, and intelligent, the PCRA court rejected appellant's claim. *See* PCRA Court Opinion, 9/19/08, at 8–11.

performance. *See* Reply Brief of Appellant (direct appeal), at 7–8. Counsel also provided a list of trial counsel's deficiencies regarding appellant's plea. *See id.* We, in fact, considered counsel's suggested factors, but found:

[T]he record supports the trial court's finding of a sufficient colloquy and a knowing, voluntary and intelligent plea to first degree murder. The record reflects that at the colloquy, [a]ppellant indicated his desire to plead guilty to the specific offense of first degree murder. Trial counsel informed the court that he had discussed with [a]ppellant how the Commonwealth's evidence was sufficient to justify a verdict of murder of the first degree . . . . The court advised [a]ppellant that by pleading guilty to first degree murder, he was pleading guilty to "the intentional, premeditated killing with malice aforethought to the victim . . . ." The court specifically inquired as to whether [a]ppellant understood the nature of the charges and the possible penalties on the related charges and [a]ppellant responded in the affirmative. The prosecutor gave a detailed summary of the evidence in support of the charges. After the summary was read, the court inquired as to why [a]ppellant was pleading guilty. Appellant responded, "Because that's the truth." He further expressed great remorse for committing the murder.

*Fears,* at 64–65 (footnote omitted) (internal citations omitted).

Furthermore, appellant argues trial counsel should have investigated his capacity to waive his rights, and this failure was not adequately raised by appellate counsel. During his interview with Dr. Martone, appellant denied any symptoms of psychosis, drug abuse, blackout, withdrawal, or health problems. *See* Report of Christine Martone, M.D., 12/15/94, at 3. Dr. Martone noted appellant "was oriented in all three spheres and his memory was intact. He was quite cooperative . . . [h]is thoughts were logical and coherent and free of loosened associations. There was no evidence of delusions or hallucinations. His affect was appropriate." *Id.* She diagnosed him with adjustment disorder, secondary to his current legal difficulties, and she determined his condition could be

managed in prison. Report of Christine Martone, M.D., 6/23/94, at 2. She also concluded appellant's suicidal ideations could be managed in a prison environment and found "[h]e has not made any sort of gesture or attempt" regarding suicide. N.T. Sentencing, 2/2/95, at 117–18. It was reasonable for trial counsel to rely on Dr. Martone's conclusions appellant was coherent and had no mental disorders besides pedophilia. *See Lesko,* at 382 (finding insofar as mental health expert failed to notice organic brain damage "may call into question [expert]'s professional performance, but that is not the same thing as providing a basis to fault trial counsel's legal performance"). Thus, appellant fails to show trial counsel lacked a reasonable basis not to further explore his capacity to plead guilty and waive his penalty phase jury. As trial counsel was not ineffective, appellate counsel cannot be deemed ineffective. Furthermore, the record supports the conclusion appellate counsel's stewardship in her litigation of the voluntariness of appellant's guilty plea was not deficient. Accordingly, appellant is not entitled to relief on this claim.

## C. Appellant's IDSI Guilty Pleas

Appellant raises four distinct challenges to his guilty plea to two counts of IDSI.

### 1. *Factual Basis for Plea to First Count of IDSI*

Appellant contends there is no factual basis for his plea to the first count of IDSI because the forcible compulsion element of IDSI was not established.[16] He claims the plea

16. The IDSI statute provides, in relevant part:
 *(a) Offense Defined.*—A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant:
 (1) by forcible compulsion;
 (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution; [or]
 * * *
 (7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other.
 18 Pa.C.S. § 3123(a)(1)-(2), (7).

also violates the *corpus delicti* rule [17] because there was no corroborating evidence of forcible compulsion. He contends appellate counsel was ineffective for not raising these arguments. The Commonwealth argues these claims were previously litigated, and appellant's actions constituted forcible compulsion. It also alleges the sexual assault occurred minutes before the murder, thus satisfying the *corpus delicti* rule. The PCRA court held this claim was previously litigated, finding the age disparity and remote location of the sexual assault supported the element of forcible compulsion. The court further determined there was a sufficient nexus between the murder and the IDSI here to satisfy the *corpus delicti* rule.

Insofar as appellant claims the trial court erred in accepting his guilty plea, his claim is previously litigated and not cognizable. *See* 42 Pa.C.S. § 9544(a)(2). Thus, only his ineffectiveness claim is cognizable. *See Collins*, at 573. As we explained on direct appeal:

> There is an element of forcible compulsion, or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts. This is especially so where the child knows and trusts the adult. In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult sufficient to induce the child to submit to the wishes of the adult ("prevent resistance"), without the use of physical force or violence or the explicit threat of physical force or violence.

17. The *corpus delicti* rule requires " 'before introducing an extra-judicial admission, the Commonwealth must establish by independent evidence that a crime has in fact been committed.' " *Commonwealth v. Edwards*, 588 Pa. 151, 903 A.2d 1139, 1158 (2006) (quoting *Commonwealth v. Reyes*, 545 Pa. 374, 681 A.2d 724, 727 (1996)). The purpose of the rule is to "prevent the admission of a confession where no crime has been committed[.]" *Commonwealth v. Bardo*, 551 Pa. 140, 709 A.2d 871, 874 n. 3 (1998).

*Fears,* at 66 (quoting *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217, 1227 (1986)). At the time of the murder, appellant was 32 years old, the victim was 12 years old, and they were alone in a secluded location. Appellant "told the victim to stand and undress. The [appellant] then began oral sodomy [on the victim]." PCRA Court Opinion, 9/19/08, at 14. Thus, the record supports the PCRA court's determination that forcible compulsion was established. As this claim is meritless, appellate counsel cannot be ineffective for failure to raise the same.

Regarding appellant's *corpus delicti* argument, Pennsylvania courts have long recognized:

[W]here a defendant's confession relates to two separate crimes with which he is charged, and where independent evidence establishes the *corpus delicti* of only one of those crimes, the confession may be admissible as evidence of the commission of the other crime. This will be the case only where the relationship between the two crimes is sufficiently close to ensure that the policies underlying the *corpus delicti* rule are not violated.

*Commonwealth v. McMullen,* 545 Pa. 361, 681 A.2d 717, 723 (1996) (quoting *Commonwealth v. DiSabatino,* 399 Pa.Super. 1, 581 A.2d 645, 648 (1990)). Appellant does not argue a lack of independent evidence supporting his murder plea. He committed the murder minutes after the sexual assault to cover up the IDSI. On direct appeal, we determined the IDSI plea fell within the closely-related crime exception; the *corpus delicti* rule was not violated. *Fears,* at 67. Thus, appellant's claim is meritless, and appellate counsel cannot be ineffective in failing to litigate the same.

### 2. *Voluntariness of IDSI Plea*

Appellant insists his plea was not knowing, voluntary, and intelligent. He claims the IDSI counts were not on the jury trial waiver forms, and he did not understand their nature because they were not read to him in understandable terms. The Commonwealth suggests this issue was previously litigated because we rejected it on direct appeal. Regardless,

the Commonwealth argues the failure to delineate the elements of an offense, without more, is insufficient to invalidate a plea, and observes the facts of appellant's offense were detailed during the oral colloquy. The PCRA court found appellant's plea was knowing, intelligent, and voluntary; however, it only addressed appellant's first degree murder plea.

Insofar as appellant alleges the trial court erred in accepting his guilty plea, his claim fails because it was previously litigated on direct appeal. *See* 42 Pa.C.S. § 9544(a)(2). Therefore, only appellant's ineffectiveness claim is cognizable. *See Collins*, at 573. Although the PCRA court did not directly address the voluntariness of the IDSI plea, we need not remand this issue. *See McGill*, at 1026 ("The PCRA court in the present case reviewed the performance of trial counsel, so a remand to allow [appellant] to properly plead and argue his claim of layered ineffectiveness would be futile."). Appellant fails to develop any argument as to why trial or appellate counsel lacked a reasonable basis for not challenging the voluntariness of his plea to the IDSI counts; thus, this claim fails for lack of development. *See Walter*, at 566 (citation omitted) (claims waived for failure to develop). Furthermore, appellant cannot prove ineffectiveness. The Commonwealth "gave a detailed summary of the facts which included those supporting ... IDSI[.]" *Fears*, at 68. Appellant previously pled guilty to an unrelated IDSI offense; thus, "he was aware of the elements of the crime. Accordingly, the trial court did not err in accepting his plea to the first count of IDSI [in the present matter]." *Id.*, at 68–69. Because appellant was aware of the facts underlying, and the nature of, his IDSI offenses, this claim is meritless, and appellate counsel cannot be ineffective in failing to litigate the same.

### 3. *Sufficient Evidence of Aggravating Circumstance*

 Appellant claims there was insufficient evidence to prove he murdered the victim in perpetration of a felony, and thus the 42 Pa.C.S. § 9711(d)(6) aggravator does not apply. He contends he did not intend to kill at the time of the IDSI as "it was only after the oral sodomy had ended, the victim

was dressed, and the victim said he was going to tell his parents he had been kidnaped [sic] that [appellant] engaged in the killing." Appellant's Brief, at 74 (citation omitted). The Commonwealth argues the murder need not occur simultaneously with the underlying felony, only that it occur close in time to the underlying felony. The PCRA court found appellant performed oral sodomy on the victim and strangled him a few minutes later, thus establishing the requisite connection for the aggravating circumstance.

■ Insofar as appellant alleges trial court error, his claim is waived for failure to raise it on direct appeal. *See* 42 Pa.C.S. § 9544(b). Furthermore, the fact-finder "may consider that the murder took place during the commission of the [felony] so long as the killing occurred so close in time and space to the [felony] that it could reasonably be considered part of that felony." *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116, 1129 (2001) (citation omitted). Here, it is sufficient that appellant killed the victim minutes after the sexual assault, after the victim threatened to report this illicit conduct. Thus, the PCRA court properly found evidence supporting the aggravating circumstance. As this claim is meritless, appellate counsel cannot be found ineffective in failing to raise the same.

### 4. *Second Count of IDSI*

■ The Commonwealth also charged appellant with IDSI arising out of his anal sodomy of the victim's body after the murder. Appellant pled guilty to this charge, but no additional penalty was imposed. On direct appeal, appellant argued the trial court should not have accepted his guilty plea to this offense; the Commonwealth conceded appellant should not have been charged with this IDSI count. We found this was harmless error as the aggravating circumstance was based solely on the first IDSI count. *Fears*, at 69–70.

Appellant now argues his guilty plea to the second count of IDSI improperly affected the trial court's weighing of aggravators and mitigators in his penalty phase. Specifically, he

claims the trial court relied upon this second conviction in sentencing him, and this error was not harmless, as it is impossible to determine the extent this second IDSI count played in weighing the mitigators and aggravators. He also suggests counsel was ineffective for advising him to plead guilty to the second IDSI count. The Commonwealth contends this claim was previously litigated because we rejected it on direct appeal. It alleges the parties proceeded with the understanding the first IDSI count was the only felony relevant to the aggravating factor. The PCRA court found appellant was not prejudiced, because the second IDSI count was not the basis for the aggravating circumstance, and he received no additional penalty for this count.

Insofar as appellant alleges trial court error, his claim was previously litigated. *See* 42 Pa.C.S. § 9544(a)(2). We have previously held the inclusion of the extraneous IDSI charge was harmless error because appellant was never sentenced on this charge, and it did not affect his penalty phase. *Fears*, at 69. We further concluded the first IDSI count was the sole basis for the only aggravating circumstance. *Id.*, at 69–70. Appellant only speculates the trial court allowed the second count of IDSI to influence its sentencing decision. He does not identify any penalty phase argument the Commonwealth made referring to this second count, or any point where the trial court indicated it relied upon the count when sentencing him. Thus, the record supports the PCRA court's finding appellant was not prejudiced by the second count of IDSI, and appellant is not entitled to relief on this claim. As this claim is unsupportable, appellate counsel cannot be ineffective for failure to raise the same.

## II. Penalty Phase

### A. Mental Health Mitigation

On direct appeal, appellant argued trial counsel's investigation and presentation of mitigating evidence was insufficient, contending counsel should have discovered "[a]ppellant was prematurely born to a twelve-year[-]old girl and suffered from cardiac arrest within one hour of his birth,

causing severe lack of oxygen to his brain; [he] was placed in foster care a few months after his birth; and [he] suffered from serious mental illness." *Id.*, at 73. Appellant presented the testimony of psychologist Ralph E. Tarter, Ph.D., who diagnosed appellant with psychopathology, including schizoid personality disorder and schizoaffective disorder. Dr. Tarter opined appellant was acting under extreme mental and emotional disturbance, and his capacity to appreciate the criminality of his conduct was substantially impaired. *Id.*[18]

On direct appeal, we noted appellant did not display any psychotic behavior, nor did he alert trial counsel as to any mental impairment. *Fears*, at 73. Because the Public Defender's Office lacked funds for an expert, and trial counsel believed Dr. Martone would provide helpful expert testimony, we found he acted reasonably. *Id.*

Appellant now proffers Amy Hurd, L.S.W., an investigator and mitigation expert.[19] Ms. Hurd indicates appellant was born with heart abnormalities to a mentally retarded and mentally ill 12–year–old. Affidavit/Declaration of Amy Hurd, L.S.W., 5/17/06, at 1. As appellant's mother was unable to care for herself, much less appellant, he was placed into a foster home; when his foster mother died less than a month later, he was placed into a new foster home.[20] *Id.*, at 1–2. The foster parents had two natural daughters, C. and S.W., and an older

18. *See* 42 Pa.C.S. § 9711(e)(2) (mitigating circumstance that "defendant was under the influence of extreme mental or emotional disturbance"); *id.*, § 9711(e)(3) (mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired").

19. Appellant also offers the affidavits and declarations of his family members and associates. Because Ms. Hurd capably relayed the information in these affidavits, we will not detail them separately.

20. Ms. Hurd indicates the second foster mother's upbringing caused her to become shy and submissive in hopes of avoiding conflict. *Id.*, at 7. The foster father was a seventh-grade dropout, who carried on an extramarital affair. He abused alcohol and used his wife's submissive nature to control her. *Id.*, at 6–7. The foster father considered himself to be in charge of the family. He began taking in foster children to receive extra income, so that his wife could quit her job. This, in turn, allowed him to come home to a clean house and a cooked meal. *Id.*, at 8.

foster son, J.R. *Id.*, at 2. Appellant and JR developed a close relationship. *See id.* The family subsequently added two more foster sons, A.W. and G.H. *Id.*, at 2–3. Appellant never received verbal assurances that he was wanted or cared for by his foster family, and he "never learned about sexual behavior and feelings ... [as] discussions about sex, even sexual organs, were off-limits[.]" *Id.*, at 8. J.R. routinely sexually assaulted both appellant and G.H. *Id.*, at 3. When he was about nine years old, appellant was also raped by an older cousin. *Id.*, at 4. Ms. Hurd reasoned "[appellant's] perception of the sexual abuse ... [was] that his abusers were helping him become acquainted with his sexuality." *Id.*

Violence was also a part of appellant's life, as appellant's foster father corporally punished all the children, acted violently when enraged, and on separate occasions pulled guns on J.R., G.H., and a contractor working at the house. *Id.*, at 12. Appellant's foster mother also used physical force for discipline. *Id.*, at 11–12. Ms. Hurd concluded appellant's family experience "was marked by terror, intimidation, helplessness, shame, avoidance, and a repetition of abusive behavior." *Id.*, at 4.

As a young teenager, appellant met his natural mother; however, because of her mental deficiencies and illness, the meeting left appellant depressed. *See id.* In school, appellant struggled academically and was frequently absent. *Id.* Ms. Hurd found "[a]s he entered adulthood, [appellant] remained childlike ...[,] acted bizarrely in front of the family[,] and threatened to kill himself with pills." *Id.*, at 5. Appellant also lacked skills necessary to obtain gainful employment and was homeless for a time. *Id.* He enrolled at a local college, where he befriended his roommate, and they lived together for five years. *Id.* The roommate was appellant's best friend and the only person he trusted; however, the roommate was depressed and once attempted suicide in appellant's presence. *Id.*

Ms. Hurd noted appellant began drinking alcohol when he was around 12 years old and began using inhalants when he was 14. *Id.*, at 13. He also associated with a known drug

user and alcoholic. *Id.* In adulthood, he would drink every day, sometimes passing out. *Id.* On three occasions, his roommate found him passed out from inhalant use. *Id.*

Ms. Hurd found appellant's family members suffered from various conditions, including bipolar disorder, schizoaffective disorder, depression, and paranoid schizophrenia. *Id.,* at 14. His maternal grandmother suffered violent mood swings and drank frequently. *Id.* Appellant's natural mother was mentally retarded and emotionally unstable, with a history of mental health hospitalizations. *Id.* She also had a daughter, who she physically abused and allowed men to sexually abuse. *Id.,* at 15–16. The daughter has since been treated for bipolar disorder, major depression, and schizoaffective disorder. *Id.,* at 16.

Dr. Martone, who interviewed appellant for his penalty phase, indicated trial counsel met with her for only ten minutes before she testified. Declaration and Affidavit of Dr. Christine A. Martone, at 1.[21] She stated her testimony was limited because trial counsel asked her few questions on direct examination, and had she been asked, she would have testified appellant was overcome with panic and terror compromising "his judgment, impulse control[,] and ability to reflect." *Id.* Thus, Dr. Martone opined appellant's panic at the time he strangled the victim overcame his ability to form the specific intent to kill. *Id.* She also stated she could have testified appellant's ability to appreciate the criminality of his conduct and conform it to the requirements of law was substantially impaired, and he was under the influence of extreme mental or emotional disturbance at the time of the crime. *Id.,* at 2.

Dr. Martone also noted trial counsel provided no "collateral data" regarding appellant's background or familial situation. *Id.,* at 1. After reviewing information provided by appellant's current counsel, she concluded appellant's "dysfunction and sexual abuse ... were substantial and caused life-long impairments. [His] biological family background also genetically predisposed him to the mental health problems from which he

21. Dr. Martone's declaration and affidavit is undated.

suffered." *Id.*, at 2. She further found this extra evidence supported the mitigating circumstances. *Id.*

Appellant next offers psychiatrist Richard G. Dudley, M.D., who examined him and reviewed various background materials, including the trial transcripts, family affidavits, medical, mental health, school, and Department of Corrections records, and information from prior psychological examinations. Dr. Dudley diagnosed appellant with major depressive disorder with psychotic features. Declaration of Dr. Richard G. Dudley, 5/25/06, at 1–2. This diagnosis was based on the fact appellant was conceived by rape, and his mother did not receive appropriate pre-natal care because she did not realize she was pregnant until halfway into the pregnancy. *Id.*, at 2. Appellant also lacked a consistent caregiver necessary for healthy development. *Id.*, at 2–3. Dr. Dudley further noted appellant's family history of bi-polar disorder, paranoid schizophrenia, and major depression, all of which have genetic components. *Id.*, at 6.

Based on the physical and sexual abuse which ran rampant in the foster family's home, Dr. Dudley found appellant "maintains the belief that the sexual abuse he suffered was consensual and part of normal sexual development." *Id.*, at 3. Appellant was also never able to feel accepted by his foster parents and was ashamed from the sexual abuse. *Id.*, at 4. He also felt shame from feeling he was gay, which was exacerbated because the family's religious views condemned homosexuality. *Id.* Further, as appellant was the only child in the family not to regularly visit his birth mother, Dr. Dudley concluded appellant suffers from feelings of abandonment. *Id.*

As a child, appellant spent time alone and created a fantasy world, which resulted in transitory psychotic states. Dr. Dudley concluded appellant returns to this fantasy world when confronted with painful situations. *Id.*, at 4–5. Starting at age nine or ten, appellant began using inhalants and drinking alcohol. By his teenage years, appellant "had already begun to exhibit the signs and symptoms of chronic alcoholism and long[-]term drug abuse. After dropping out of high school,

[he] began to prostitute himself to get drugs. [He] remained a chronic alcoholic and drug user until he was arrested[.]" *Id.*, at 5. Dr. Dudley observed those suffering from childhood trauma develop fear responses, become overly sensitive to traumatic events, and react impulsively. *Id.*

As an adult, appellant was still child-like. He was depressed, continued to abuse drugs and alcohol, and prostituted himself. *Id.* Appellant and his roommate were emotionally codependent, and appellant was financially dependent on the roommate. A few weeks before the murder, the roommate told appellant he would return to Japan. This caused appellant to reenter his fantasy world, and he was clinically depressed and in a psychotic state. *Id.*, at 7.

Dr. Dudley found, on the day of the murder, appellant "was psychotic, severely depressed[,] and had been drinking heavily. He attempted, what to him, was consensual sexual play with [the victim.]" *Id.* Dr. Dudley stated appellant's history of sexual abuse warped his sense of appropriate sexual activity, and when the victim said he would "tell . . . about [appellant's] advances, [appellant] was overcome by confusion at what he perceived as [the victim]'s betrayal." *Id.* He found appellant was psychotic at the time of the murder, and still has trouble distinguishing fantasy from reality regarding the murder. Thus, Dr. Dudley opined appellant suffered from a diminished mental capacity at the time of the offense and lacked the ability to form specific intent to kill. He also opined appellant suffered extreme mental and emotional disturbance, and he had a substantially impaired ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Dr. Dudley also found the evidence supported the catch-all mitigator. *Id.*, at 8.

Appellant also presents an affidavit from Harry Krop, Ph. D., a psychologist who evaluated and tested appellant, reviewed various records, and reviewed the affidavits of family members and mental health professionals. Declaration and Affidavit of Harry Krop, Ph.D., 6/7/06, at 1–2. Dr. Krop diagnosed appellant with major depressive disorder with psychotic features. He further found appellant suffered from low

self-worth and depressive episodes, which included suicidal ideation. Dr. Krop noted appellant was unable to support himself or maintain gainful employment; he would, at times, decompensate into psychosis, and family members reported bizarre behavior. *Id.*, at 5–6.

Dr. Krop also found appellant suffers from "neuropsychological deficits consistent with organic brain damage in the temporal and frontal lobes[,]" which can cause "impulsivity, disorganized thinking, socially inappropriate and irrational behavior, exaggerated responses to stimuli, poor judgment, inability to comprehend consequences of behaviors, and difficulty interpreting the actions and intentions of others. Stressful situations and drug and alcohol use magnify the effects of these underlying impairments." *Id.*, at 4. Thus, he opined appellant had long-standing neuropsychological deficits, which were aggravated on the day of the murder by alcohol consumption and the stress of his roommate's imminent departure. *Id.* Dr. Krop concluded appellant's "deficits would have significantly influenced his decision-making, perception and judgment on the day of the offense." *Id.*, at 6. Dr. Krop found these impairments caused appellant to suffer from diminished capacity at the time of the offense. Further, he opined appellant was suffering from an extreme emotional disturbance, which impaired his ability to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. Finally, Dr. Krop found appellant's dysfunctional family life and substance abuse supported the catch-all mitigating circumstance. *Id.*, at 7.

Dr. Tarter, the psychologist who testified for appellant at the evidentiary hearing regarding his ineffectiveness claims on direct appeal, reviewed the affidavits of Ms. Hurd and Drs. Dudley and Krop and found they showed appellant was severely disturbed prior to the murder, and "this disturbance was exacerbated by stress-induced panic resulting in transient psychosis at the time of the homicide." Affidavit/Declaration of Ralph E. Tarter, Ph.D., at 1–2.[22] Dr. Tarter opined appellant is genetically compromised, and his fetal development was

22. Dr. Tarter's affidavit/declaration is also undated.

likely suboptimal. Appellant's childhood, which included rigid disciplinary practices and violent sexual victimization, amplified these conditions. Thus, Dr. Tarter diagnosed appellant with schizoaffective disorder, which manifests as "deficient self-control, low capacity to appropriately and empathetically relate to others, social isolation, chronic tension, and depressive features." *Id.*, at 2. He further determined "[u]nder stress, [appellant's] thinking processes become psychotic, especially paranoidal, at which time [his] behavioral self-management is sharply diminished." *Id.*

Dr. Tarter noted appellant, beginning early in life, engaged in severe substance abuse, and the departure of "a homosexual lover ... prior to the [murder] further elevated his stress state and eliminated his only interpersonal resource for emotional support and sexual relief." *Id.*, at 3. Because of appellant's substance abuse, stress, separation from his roommate, and "sexual arousal in the company of boys[,]" Dr. Tarter concluded appellant suffered from a diminished capacity to control and appreciate the implications of his actions. *Id.* Dr. Tarter opined appellant committed the sexual assault because he had low self-control, and when the victim said he was going to inform his parents, "severe panic overtook him such that the hyperaroused state precipitated a transient psychotic episode and further diminished [his] self-control." *Id.*

Appellant admits this mitigating evidence claim was previously raised on direct appeal, but contends it is cognizable because he now presents different mitigating evidence. He argues, had trial counsel investigated his background, counsel could have presented this evidence and offered a mitigating expert at the penalty phase. He claims trial counsel should have presented mental health experts to testify as to the severity of his mental health difficulties, as there were several "red flags" trial counsel should have recognized as indicative of potential mental health issues, requiring further investigation. Appellant identifies these "red flags" as the molestation mentioned in the pre-sentence report, appellant's alcohol abuse, and his belief some unnatural force was at work during the murder. Appellant further alleges trial counsel's failure

was caused by counsel's inexperience, lack of resources, and overwhelming caseload. He argues, because the sentencing court never learned about his upbringing, he was prejudiced.

 The Commonwealth responds that this claim was previously litigated because appellant raised the same legal issue on direct appeal. Noting we found trial counsel's decision to limit investigation reasonable, the Commonwealth argues this is the "law of the case." [23] It further contends appellant had the opportunity to introduce additional background information when he read and did not object to the substance of the pre-sentence report, which contained his background information. The Commonwealth maintains trial counsel did not have reason to question appellant's mental health, as he did not display psychotic behavior and police officers who interviewed him indicated he was composed and cooperative. Finally, it argues there was no prejudice, given the severity of the aggravating circumstance, and appellant's proffer is not reliable because he has an incentive to exaggerate his condition.

The PCRA court found this claim was previously litigated. The court also determined the interaction between trial counsel and appellant gave no indication appellant was mentally impaired. Nonetheless, counsel introduced Dr. Martone's testimony because he thought it would be beneficial, and he knew the sentencing court had previously viewed Dr. Martone's testimony favorably. The court also noted counsel went to the trouble of obtaining appellant's roommate's letter from Japan to present on appellant's behalf. The court found appellant could have requested a deeper investigation, and the presentence report and lack of witnesses at appellant's post-sentence evidentiary hearing show appellant's family "were either unavailable or unwilling to testify." PCRA Court Opin-

23. The "law of the case" doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995) (citations omitted).

ion, 9/19/08, at 21. Thus, the PCRA court found there was a reasonable basis for trial counsel's actions.

Appellant's claim appellate counsel was ineffective for failing to investigate and present evidence of appellant's family and social history on direct appeal has not been previously litigated. Therein, he contends Dr. Tarter could have testified as to the impact of the sexual abuse appellant suffered, and Dr. Dudley could have testified as to the effect of multiple foster care placements, sexual abuse, and the dysfunctional home environment. He alleges a psychologist could have testified he suffered psychosis and how his family and social factors impacted his decision-making, perception, and judgment. Thus, he contends appellate counsel's omission deprived this Court of the opportunity to fully consider the extent of his mental impairment.

Appellant's argument concerning appellate counsel's lack of reasonable basis focuses on the mitigating evidence appellate counsel allegedly could have obtained. Regarding appellate counsel's reasoning in not further investigating mitigating evidence, appellant only claims "[a]ppellate counsel could not have had any reasonable basis for failing to contact those family members, particularly because appellate counsel was attempting to establish that trial counsel was ineffective for failing to ... present available mitigating evidence." Appellant's Brief, at 51. Appellant offers no evidence regarding appellate counsel's decision to stop investigating his background, such as her reasoning or her resources. Thus, he fails to " 'reconstruct the circumstances of counsel's challenged conduct' and 'evaluate the conduct from counsel's perspective at the time[,]' " *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (2011) (quoting *Strickland*, at 689, 104 S.Ct. 2052), and fails to prove, pursuant to *Strickland*, that appellate counsel's performance was unreasonable.

Appellant also attacks trial counsel's effectiveness, which we will view as an assertion of appellate counsel's ineffectiveness for deficiently litigating this allegation. On direct appeal, we considered and rejected appellant's claim that trial counsel's "investigation and presentation of mitigation evidence was

insufficient." *Fears,* at 73. It is clear on the record that a claim of trial counsel's ineffectiveness for failing to explore mitigating circumstances was developed by appellate counsel at the hearing and was adequately briefed. *See* Appellant's Brief (direct appeal), at 32–59; *see also* N.T. PCRA Hearing, 6/27–28/00, at 112–19. This was not an instance where appellate counsel raised a non-record-based claim with little or no support. *See Fears,* at 73 (finding "this claim appears to be of arguable merit"; however, ultimately concluding trial counsel not ineffective). Thus, appellant has failed to prove appellate counsel was ineffective for failure to properly litigate trial counsel's ineffectiveness, and appellant's mitigating evidence claim fails.

## B. Execution of the Chronically Mentally Impaired

 Referring to his mental health mitigation claim proffer, *see supra* Part II.A, appellant claims he suffers from chronic mental impairments. Observing the Eighth Amendment prohibits execution of the mentally incompetent and mentally retarded,[24] he argues these "protections should be extended to chronically mentally impaired individuals such as [himself]." Appellant's Brief, at 68. The Commonwealth contends appellant failed to prove he suffers from a chronic mental illness, nor does he develop any meaningful argument why the Eighth Amendment prohibits execution of the chronically mentally impaired. The PCRA court, treating this as an *Atkins* claim, determined appellant failed to prove he was mentally retarded.

Although the PCRA court did not directly address this issue, we need not remand for further consideration because we can resolve this claim on the existing record. *See McGill,* at 1026 (declining to remand when remand will be futile). We have previously held the Eighth Amendment does not prohibit execution of a mentally ill person because *Atkins* did not

24. *See Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (prohibiting execution of mentally retarded); *Ford v. Wainwright,* 477 U.S. 399, 409–10, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (finding Constitution prohibits executing mentally insane).

encompass that class of persons. *See Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 96–97 (2008) (quoting *Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 38 (1991)). However, this case differs from *Baumhammers,* as the defendant there raised his Eighth Amendment claim on direct appeal, whereas appellant has raised his on collateral review. Recently, we explained "[t]he PCRA provides a mechanism for vindicating *existing* constitutional rights, and it also provides a mechanism for implementing new constitutional rules of retroactive application, no matter when the new rule is established." *Commonwealth v. Robinson,* 2013 Pa. Lexis 3265, at *65 (Pa. December 27, 2013) (citing 42 Pa.C.S. § 9545). In *Robinson,* we rejected the defendant's claim on collateral review that *Atkins* should be expanded to apply to brain-damaged individuals convicted of first degree murder, noting, "In general, the proper way to seek to secure innovations in constitutional law is upon direct review, not via the PCRA." *Id.* This is because the PCRA provides a means to obtain relief based on existing or newly-recognized constitutional rights, *see* 42 Pa.C.S. § 9543(a)(2)(i); *id.,* § 9545(b)(1)(iii); however, the right must first exist for a petitioner to claim it as a basis for relief. Here, appellant seeks to have a new substantive constitutional rule declared, and then to have that rule applied to him retroactively. Therefore, his claim is not cognizable under the PCRA. Additionally, besides several citations to *Atkins* and a reference to evolving standards of decency, appellant fails to present any analysis as to why the Eighth Amendment prohibits execution of the chronically mentally ill. Accordingly, this claim is also waived for lack of development. *See Walter,* at 566 (citation omitted).

## C. Waiver of Penalty Phase Jury

■ Appellant alleges his waiver of a penalty phase jury was not knowing, voluntary, and intelligent, because the trial court failed to explain or define critical terms used in the colloquy, failed to identify the aggravating circumstances the Commonwealth intended to pursue, did not advise him the

jury need not unanimously agree on each mitigating circumstance,[25] and did not advise him a death sentence would not be imposed if even one juror believed the mitigators outweighed the aggravators. He also contends the trial court failed to obtain a written waiver. *See* Pa.R.Crim.P. 620 ("The waiver [of a jury trial] shall be in writing[.]"). He argues trial counsel should have objected to this waiver, and appellate counsel was ineffective in failing to argue the waiver should have been in writing. The Commonwealth argues the oral colloquy was sufficient for appellant to waive his penalty phase jury. The PCRA court found this claim was previously litigated, and that appellant's waiver of a penalty phase jury was knowing, intelligent, and voluntary. In his reply brief, appellant admits appellate counsel argued the ruling should have been in writing but claims, because we did not expressly decide this claim, we should decide it now.

Even though we did not explicitly decide the Rule 620 claim, our conclusion that appellant's waiver of his penalty phase jury was knowing, intelligent, and voluntary negates relief; appellant is not entitled to relitigate this claim. *Collins*, at 570. Specifically, on direct appeal, we held trial "counsel was not ineffective for failing to object to a sufficient colloquy" when appellant waived his penalty phase jury. *Fears*, at 71. On direct appeal, appellate counsel adequately developed this claim at the hearing, and the claim was adequately briefed. *See* Appellant's Brief (on direct appeal), at 74–80; *see also* N.T. PCRA Hearing, 6/27–28/00, at 143–47. Notwithstanding the foregoing, we found:

> Trial counsel informed [a]ppellant that he had a right to have his sentencing matter heard by twelve citizens, that the jury would have to find beyond a reasonable doubt that the Commonwealth had established any aggravating circumstances, and that the jury would determine whether the defense had presented mitigating factors by a preponderance of the evidence. He was also informed that the jury would have to be unanimous in finding beyond a reasonable

25. *See Mills v. Maryland*, 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (holding penalty phase jury need not unanimously agree on existence of mitigating circumstance).

doubt that the aggravating factors outweighed the mitigating factors and that the jury could render a verdict requiring [a]ppellant to be put to death by lethal injection. Appellant indicated that he understood these rights. When asked whether he had been threatened or coerced into waiving his sentencing jury, [a]ppellant responded in the negative and indicated that the decision was made of his own free will. Appellant stated that he never suffered from any mental or physical illness or had any drugs or alcohol that would affect his ability to understand what was occurring. Finally, [a]ppellant agreed that he had enough time to speak with counsel regarding his decision to waive a sentencing jury and that he was satisfied that he fully understood the implications of waiving such right.

Moreover, contrary to his assertions, [a]ppellant was informed of the *Mills* protections. Trial counsel stated at the colloquy, "[t]hat any single juror who might not agree with the majority would cause that—cause the [c]ourt to have to impose a sentence of life." Trial counsel further expressly testified at the evidentiary hearing that he had discussed with [a]ppellant the function of a jury in a penalty proceeding and the fact that the jury need not be unanimous in finding a mitigating factor.

*Fears*, at 70–71 (internal citations omitted). The trial court properly found appellant's waiver of a penalty phase jury was knowing, intelligent, and voluntary. Accordingly, appellate counsel was not ineffective in her litigation of this meritless claim.

## D. Prosecutorial Misconduct

 Appellant argues the prosecutor, in his penalty phase closing argument, improperly stated appellant was " 'a hunter, a predator[,]' " Appellant's Brief, at 89 (quoting N.T. Sentencing, 2/2/95, at 152–53), and " 'there's no mitigation in this case.' " *Id.* (quoting N.T. Sentencing, 2/2/95, at 156). He submits trial counsel was ineffective in failing to object because "[t]he prosecutor's improper arguments bolstered the Commonwealth's troubled case, *misdirected the jury,* and unfairly influenced the jury's assessment of the evidence."

*Id.,* at 90 (emphasis added). The Commonwealth notes it may make logical inferences in arguments and contends, because the trial court was the fact-finder, we should presume the trial court disregarded any improper argument. The PCRA court found, because there was no jury, the judge is presumed to disregard any inadmissible statements. PCRA Court Opinion, 9/19/08, at 4–5 (citing *Commonwealth v. Brown,* 328 Pa.Super. 215, 476 A.2d 969, 971 (1984)).

As there was no jury at appellant's trial, appellant's claim is a *non sequitur,* suggesting "cut and paste" written advocacy. The trial court sentenced appellant, and "[i]t is presumed that a trial court, sitting as fact[-]finder, can and will disregard prejudicial evidence." *Commonwealth v. Miller,* 605 Pa. 1, 987 A.2d 638, 670 (2009) (citations omitted). Further, to prevail on a prosecutorial misconduct claim, appellant must show the prosecutor's actions had the unavoidable effect of undermining the fact-finder's neutrality so as to preclude a true verdict. *Commonwealth v. Kennedy,* 598 Pa. 621, 959 A.2d 916, 923–24 (2008) (citation omitted). Here, appellant develops no such argument. Thus, this claim fails for lack of development. *See Walter,* at 566 (citation omitted). Further, because appellant fails to show this alleged misconduct improperly influenced the trial court and denied him a fair trial, he cannot prove prejudice. Accordingly, the PCRA court properly concluded relief is unwarranted, and appellate counsel was not ineffective in failing to raise a meritless claim of trial counsel's ineffectiveness.

### E. Constitutionality of the Aggravating Circumstance

Appellant was sentenced based on the aggravating circumstance that he "committed a killing while in the perpetration of a felony." 42 Pa.C.S. § 9711(d)(6). He alleges counsel was ineffective for not challenging the constitutionality of this aggravator, because it fails to genuinely narrow those eligible for the death penalty. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). He contends he merely committed "IDSI gone awry[,]" and claims someone who plans a murder would be more blameworthy. Appellant's Brief, at 96. The Commonwealth responds that we have

previously held this aggravator is constitutional. This claim was raised on direct appeal; however, it was dismissed without prejudice. *Fears*, at 71. On PCRA review, the PCRA court noted a statute is presumed constitutional, and it is constitutional to impose the death penalty for a murder committed in the perpetration of a felony. PCRA Court Opinion, 9/19/08, at 5.

It is well settled that 42 Pa.C.S. § 9711(d)(6)'s aggravating circumstance is constitutional. *See Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023, 1035 (1989) (citations omitted) ("[T]he death penalty may constitutionally be imposed for a murder of the first degree that is committed while in the perpetration of a felony."). Accordingly, the PCRA court did not err in rejecting appellant's claim, and appellate counsel was not ineffective in failing to raise the same.

### F. Victim Impact Evidence

The trial court, in its sentencing decision, considered appellant's pre-sentence report, which noted the victim's mother was too upset to speak with the pre-sentence investigator, and another of appellant's victims had to undergo months of counseling.[26] Appellant, correctly noting Pennsylvania law did not permit victim impact evidence at the time of his trial, argues the pre-sentence report constituted improper and inflammatory victim impact evidence. He claims counsel was ineffective for failing to object to it, and the trial court did not disregard it as it considered the pre-sentence report in sentencing. The Commonwealth agrees these statements were inadmissible, but again contends the trial court is presumed to disregard all irrelevant or inadmissible evidence. The Commonwealth further notes the trial court stated it only considered mitigating evidence from the report. The PCRA court found this claim previously litigated. PCRA Court Opinion, 9/19/08, at 2.

On direct appeal, appellant did not argue these statements were improper victim impact evidence; he merely argued trial

---

**26.** Appellant notes the second victim testified at the penalty phase, but does not develop any argument as to how this testimony was improper.

counsel was ineffective for introducing prejudicial evidence. Thus, appellant raises a new, distinct claim, and the PCRA court erred in finding this claim previously litigated. However, no remand is warranted because appellant is not entitled to relief. *See McGill*, at 1026. The trial court did not consider extraneous or improper information contained in the pre-sentence report in fashioning its sentence. *See* Trial Court Opinion, 6/4/02, at 14–15. Additionally, appellant cannot prove prejudice because "[i]t is presumed that a trial court, sitting as fact[-]finder, can and will disregard prejudicial evidence." *Miller*, at 670 (citations omitted). Although the trial court relied on the pre-sentence report in its sentencing decision, appellant fails to prove the trial court relied on any of the improper victim impact evidence. Accordingly, appellate counsel was not ineffective in failing to raise a meritless claim of trial counsel's ineffectiveness, and this claim fails.[27]

### III. Other Claims

### A. Whether this Court Created a New Rule on Direct Appeal

■ On direct appeal, appellant argued Pennsylvania law prohibits defendants from pleading guilty to first degree murder. We have stated in *dicta* that Pennsylvania law prohibits

27. Our review of appellant's claims leads us to conclude appellate counsel, whose stewardship is the focus of our analysis, provided more than adequate representation of appellant on direct appeal. The dissent notes trial counsel's efforts appear to have taken the path of least resistance, and that trial counsel's deficiencies raise serious questions concerning whether appellant was afforded his constitutional right to effective representation. While we agree the Commonwealth has an obligation to provide an indigent capital defendant with the resources necessary for his defense, we do not believe, in the context of the circumstances, appellant received less than his entitlement. Appellate counsel litigated claims focused on trial counsel's representation, underscoring in both written and oral advocacy the very facets of trial counsel's performance about which the dissent expresses concern. The alleged deficiencies of trial counsel that appellant now focuses on were not overlooked by appellate counsel, as the concurrence explains in more detail. Having thoroughly examined appellate counsel's performance, which we have concluded was not below constitutional standards, we reject the assertion that appellant is entitled to further evidentiary proceedings in order to pursue his claims pertaining to trial counsel.

a guilty plea to first degree murder, but we have also upheld convictions predicated on guilty pleas to first degree murder.[28] On appellant's direct appeal, we concluded the death penalty statute allowed for a guilty plea to first degree murder. *Fears*, at 63 (quoting 42 Pa.C.S. § 9711(b)). Further, we found Pa.R.Crim.P. 802 did not require defendants pleading guilty to murder to plead guilty to murder generally. *Fears*, at 63.

Appellant argues this interpretation of Pennsylvania law was novel and applied to him without warning, in violation of his Eighth Amendment and due process rights. The Commonwealth contends this claim is waived because appellant never filed a reargument application and frivolous because we have held *Fears* created no new law. The PCRA court found Pennsylvania's death penalty statute permits guilty pleas to first degree murder, and Pa.R.Crim.P. 802 permits a guilty plea without a degree of guilt hearing. Thus, the court concluded appellant's guilty plea was permissible.

**28.** *Compare Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891, 895 n. 3 (1997) (citation omitted) (observing trial court refused first degree murder plea because "a defendant may not enter a guilty plea to murder in the first degree"), *and Commonwealth ex rel. Andrews v. Russell*, 420 Pa. 4, 215 A.2d 857, 858 (1966) (observing, in challenge to sufficiency of first degree murder conviction, "defendant cannot plead guilty to murder either of the first degree or ... second degree, but must plead guilty to murder generally"), *and Commonwealth ex rel. Kerekes v. Maroney*, 423 Pa. 337, 223 A.2d 699, 701 (1966) (noting, in challenge to second degree murder plea, "defendant may not enter a guilty plea to murder in the first degree"), *and Commonwealth v. Jones*, 355 Pa. 522, 50 A.2d 317, 319 (1947) (noting defendant pled guilty to murder generally because accused may not plead guilty to first degree murder), *and Commonwealth v. Iacobino*, 319 Pa. 65, 178 A. 823, 825 (1935) (citation omitted) ("When an accused enters a plea of guilty to an indictment charging murder, he does not plead guilty to murder in the first degree[.]"), *with Commonwealth v. Fiebiger*, 570 Pa. 583, 810 A.2d 1233, 1239 (2002) (affirming guilty plea to first degree murder), *and Commonwealth v. Ockenhouse*, 562 Pa. 481, 756 A.2d 1130 (2000) (accepting guilty plea to death sentence for first degree murder), *and Commonwealth v. Michael*, 544 Pa. 105, 674 A.2d 1044 (1996) (affirming death sentence where trial court accepted guilty plea to first degree murder). Appellant does not develop any argument as to how the statements concerning inability to plead guilty to first degree murder were not *dicta*, nor does he offer any case were we directly held an accused may not plead guilty to first degree murder.

As the PCRA court correctly noted, we did not create new law on direct appeal. We have held "[o]ur holding in *Fears* ... rests on the more solid jurisprudential foundation of our death penalty statute, ... Pennsylvania Rule of Criminal Procedure 802, and several instances where our court had affirmed the judgments of sentence where defendants entered guilty pleas to first-degree murder charges." *Commonwealth v. Singley*, 582 Pa. 5, 868 A.2d 403, 410 (2005) (citations omitted). Appellant does not mention *Singley*, much less develop any argument as to why its holding was incorrect. Because we created no new law on direct appeal, this claim is meritless.

## B. Proportionality Review

 Appellant was sentenced to death in 1995, at which time Pennsylvania's death penalty statute required this Court to determine whether a death sentence was "excessive or disproportionate to the penalty imposed in similar cases." 42 Pa.C.S. § 9711(h)(3)(iii) (repealed 1997).[29] Appellant argues he never received proportionality review on direct appeal; otherwise, we would have found his sentence disproportionate. He further argues the lack of proportionality review denied him due process in violation of the Sixth, Eighth, and Fourteenth Amendments. He also claims this violates his *ex post facto* rights.[30] Therefore, he contends his death sentence

29. To facilitate proportionality review, the President Judge of each Court of Common Pleas transmitted the Murder of the First Degree Review Form for each first degree murder conviction after September 13, 1978, providing details of the crime, the defendant, and the victim. The Administrative Office of Pennsylvania Courts (AOPC) used this information to create a database upon which a statistical analysis of sentences in first degree murder cases could be performed. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426, 439 (1997), *abrogated on other grounds by Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1142 (2001). On June 25, 1997, the General Assembly repealed proportionality review. However, we determined the repeal of proportionality review was prospective, and those sentenced to death prior to the repeal were entitled to proportionality review. *Id.*, at 440.

30. We have found:

A law violates the *ex post facto* clause of the United States Constitution if it (1) makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action;

should be vacated. The Commonwealth agrees appellant did not receive proportionality review on direct appeal and contends the remedy is to provide appellant proportionality review now. The PCRA court acknowledged appellant was entitled to proportionality review and found he received it on direct appeal. The court noted we referred to the proportionality statute, found sufficient evidence supported the aggravating circumstance, and concluded the sentence was not the product of passion, prejudice, or any other arbitrary factor.

While the PCRA court noted we referred to the proportionality review statute, we only referred to § 9711(h)(3)(i)-(ii), which never included proportionality review. *See Fears*, at 74. Further, we never referred to, or discussed, proportionality review on direct appeal. Accordingly, the PCRA court's finding that we conducted proportionality review is not supported by the record.

Appellant's preferred remedy of a new penalty phase is not viable. Proportionality review was an appellate process, not part of sentencing. *See Commonwealth v. Chester*, 557 Pa. 358, 733 A.2d 1242, 1258 (1999) (noting proportionality review is appellate process), *abrogated on other grounds by Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). Because the lack of proportionality review would not have affected appellant's penalty phase, he is not entitled to a new penalty phase. Indeed, it makes no sense to require the trial court to conduct a new sentencing hearing because of how this Court disposed of appellant's direct appeal. Furthermore, appellant's desired relief is futile. Appellant would not be entitled to proportion-

(2) aggravates a crime, or makes it greater than it was when committed; (3) changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed; or (4) alters the legal rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offense in order to convict the offender.

*Commonwealth v. Allshouse*, 604 Pa. 61, 985 A.2d 847, 861 (2009) (citing *Carmell v. Texas*, 529 U.S. 513, 522, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000)), *vacated on other grounds*, —— U.S. ——, 131 S.Ct. 1597, 1598, 179 L.Ed.2d 495 (2011) (per curiam). The repeal of proportionality review did not alter the definition or maximum punishment for first degree murder. It also did not in any way alter the rules of evidence. Accordingly, appellant's *ex post facto* argument fails.

ality review after a new penalty phase, as such review has been abolished for defendants sentenced after its repeal. Therefore, to grant appellant his desired relief would only deny him the proportionality review he claims he should receive. Accordingly, it will not be granted. *See McGill*, at 1026 (declining to remand when remand will be futile).

To prove a due process violation, appellant must demonstrate he was prejudiced by the lack of proportionality review. *See Taylor v. Horn*, 504 F.3d 416, 449 (3d Cir.2007) (quoting *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir.1997)) ("[W]hen considering whether an error under state law implicates due process, 'we require more than that the defendant simply be prejudiced .... The standard requires that the defendant be prejudiced in a very particular way.' "); *see also In re Lokuta*, 608 Pa. 223, 11 A.3d 427, 439 (2011) (citing *Commonwealth v. Brado*, 470 Pa. 306, 368 A.2d 643, 645 (1977)) (rejecting due process claim because appellant failed to prove prejudice). Appellant argues, had he received proportionality review, we would have found his sentence disproportionate because he was sentenced "despite his confession, guilty plea, waiver of jury, and a finding of mitigation by the trial court, and despite the fact the Commonwealth presented evidence of only a single invalid aggravating circumstance." Appellant's Brief, at 94. He admits proportionality review involved the comparison of the facts of his case against similar death-eligible cases, but he does not cite any similar case to show his sentence was disproportionate, nor further explore the facts of his own case. Accordingly, appellant's prejudice argument fails for lack of development. *See Walter*, at 566 (citation omitted). Even if this claim was developed, he would not be entitled to relief because he fails to prove prejudice.

## C. Evidentiary Hearing

Appellant argues he was entitled to an evidentiary hearing "on those claims where there is a dispute of fact and where the PCRA Court denied a hearing." Appellant's Brief, at 11. A PCRA court has discretion to dismiss a petition if it is satisfied there are no genuine issues concerning any materi-

al fact or any other legitimate purposes for an evidentiary hearing. *Washington,* at 617, 104 S.Ct. 2052 (quoting Pa. R.Crim.P. 909(B)(2)). Here, appellant fails to present any material issues of fact warranting an evidentiary hearing.[31] As we find none of appellant's claims raise genuine issues of material fact, the PCRA court did not abuse its discretion in denying an evidentiary hearing.

### D. Cumulative Effect

 Appellant argues the cumulative prejudicial effect of the errors he alleged entitles him to relief. The Commonwealth responds that no amount of failed claims may collectively attain merit. The PCRA court rejected this argument, as none of appellant's claims had merit.

"[I]f multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 532 (2009) (citing *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994)). We only rejected two of appellant's claims—his claim trial counsel was ineffective in not objecting to the second IDSI count and his argument that trial counsel should have objected to victim impact evidence—solely because of his failure to prove prejudice.[32] These claims are so disparate that even if considered cumulatively, we are confident they could not affect the outcome of appellant's case, especially as the trial court presumably disregarded improper evidence. Accordingly, appellant has failed to show he is entitled to relief based on the cumulative effect of errors.

As appellant has failed to establish any of his claims entitle him to a new guilt phase or penalty phase, we affirm the PCRA court's order. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

**31.** While the Commonwealth does dispute the existence, credibility, and extent of appellant's proffered .evidence, none of these disputes are material to our decision.

**32.** In other claims where we expressly found appellant failed to prove prejudice, we did so as an alternative holding.

The order of the PCRA court is affirmed.

Jurisdiction relinquished.

Justice STEVENS did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices BAER, TODD and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

### CONCURRING OPINION

Chief Justice CASTILLE.

I join the Majority Opinion. I write separately to paint a fuller picture as to why I conclude that the Majority properly denies relief on appellant's claims in his first petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.

To the extent appellant's current claims depend upon a finding that counsel was ineffective on direct appeal, my own examination of the direct appeal record convinces me that appellant is not entitled to a remand for an evidentiary hearing. Two examples suffice to make my point. I turn first to appellant's claim that trial counsel was ineffective in failing to present a diminished capacity defense. The Majority correctly observes that appellate counsel raised this claim on direct appeal and developed expert testimony in support of the claim. What is not fully or adequately conveyed by either this Court's opinion on direct appeal or today's Majority Opinion is the comprehensiveness of appellate counsel's presentation of this claim.[1]

1. The analysis and rejection of this issue was contained in a footnote in this Court's opinion on direct appeal. The Court performed a cursory analysis, combining the issue with a claim that trial counsel should have pursued a second-degree murder theory, stating:

 Appellant also argues that counsel was ineffective for advising him to plead guilty to first degree murder because the evidence establishes a

This was not an instance where direct appeal counsel raised a non-record-based claim with little or no support; instead, a review of the direct appeal briefs and evidentiary hearing transcripts reveals appellate counsel's competent performance. Counsel's brief in this Court argued that trial counsel should have had appellant examined by a psychiatric expert prior to the entry of his guilty plea to first-degree murder. This position was supported by appellate counsel's questioning of trial counsel at the post-trial evidentiary hearing, where she pointedly asked trial counsel questions as to why he did not explore obtaining an expert before advising appellant to plead guilty, especially given the circumstances surrounding the murder which suggested that appellant had engaged in sexual acts with a dead victim. *See* N.T., 6/27–28/2000 (evidentiary hearing), at 93–96, 106–07. Appeal counsel also adduced through questioning trial counsel that Dr. Christine Martone, M.D., the chief psychiatrist at the Allegheny County Jail who was appointed by the trial court to evaluate appellant, only examined appellant after the entry of the guilty plea. Upon further questioning by appellate counsel, trial counsel testified that he relied on Dr. Martone's expert report instead of obtaining a defense expert because he believed that she would be "neutral" and that there were only limited funds available for hiring experts by the Allegheny County Public Defender's Office. However, counsel further admitted that he never made an inquiry about such funds. *Id.* at 117; *see also Fears,* 836 A.2d at 73.[2]

lesser degree of homicide. In *Commonwealth v. Marsh,* 440 Pa. 590, 271 A.2d 481, 483 (Pa.1970), we held that the key question is whether the defendant had the opportunity to make a reasonable choice. This claim lacks arguable merit because Appellant was advised of the elements of first degree murder as well as the differences between the various degrees of criminal homicide prior to the entrance of his plea in open court. Thus, Appellant had an opportunity to make a reasoned decision.

*Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 64 n. 11 (2003) (record citation omitted). The relative brevity of our analysis, of course, does not reflect upon the performance of counsel in raising and developing the issue.

2. The U.S. Supreme Court has recognized that counsel is "entitled to formulate a strategy that was reasonable at the time and to balance

Furthermore, also during the evidentiary hearing, direct appeal counsel presented expert testimony in support of a diminished capacity theory via Dr. Ralph Tarter, Ph.D., who specialized in clinical psychology and neuropsychology. Dr. Tarter conducted neuropsychological testing of appellant, reviewed background records provided by appellate counsel (which coincidentally were not obtained by trial counsel, *see* N.T., 6/27–28/2000, at 109), and reviewed the trial transcripts and police reports. Dr. Tarter testified to possible mitigating circumstances, but, more importantly for purposes of the instant claim, unequivocally opined that appellant was acting under diminished capacity at the time of the murder. *See id.* at 225 ("Based upon everything that I said this morning, I think quite strongly that the circumstances around that event, Mr. Fears decompensated, was psychotic and he certainly was functioning under extreme diminished capacity. I am sure he had no capacity at that point to clearly link behavior and intent to consequences.").

It is true that direct appeal counsel ultimately tied her claim of trial counsel's ineffectiveness for failing to explore evidence in support of third-degree murder, *i.e.*, diminished capacity, to the overarching theory that trial counsel should never have advised appellant to plead guilty to first-degree murder. But, the fact remains that a claim of trial counsel ineffectiveness for failing to explore a diminished capacity defense was developed by appellate counsel at the hearing, and the claim was presented, and eventually rejected, on direct appeal. In my view, under these circumstances, the present layered ineffectiveness claim, which must focus upon appellate counsel, lacks merit, and indeed, amounts to little more than hindsight second-guessing. As the Majority observes, "[m]erely because appellate counsel could have presented more or different experts does not prove she acted unreasonably." *See* Majority Opinion at 464, 86 A.3d at 806.

limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107, 131 S.Ct. 770, 789, 178 L.Ed.2d 624 (2011). Failure even to attempt to secure limited funding, of course, is not reasonable.

Second, regarding appellant's claim that his mental health impairments prevented him from entering a knowing, voluntary, and intelligent guilty plea and waiver of a jury for purposes of the penalty phase, a more thorough review of direct appeal counsel's performance likewise sheds important light. The Majority determines that appellant cannot demonstrate that he was prejudiced by direct appeal counsel's presentation of this claim. The Majority bases its conclusion on the fact that "appellate counsel posited 12 factors to be considered" by this Court on direct appeal and provided a list of trial counsel's alleged deficiencies. *See* Majority Op. at 465, 86 A.3d at 806–07.

I would supplement this analysis by noting that, in the Reply Brief of Appellant filed on direct appeal, counsel addressed the prospect that this Court would decide that a totality of circumstances review was appropriate to decide appellant's challenge to the voluntariness of his guilty plea (the course the Court in fact ultimately followed). Counsel indeed posited twelve factors that should be considered in conducting such an analysis. As the Majority notes, eight of the enumerated factors specifically focused on trial counsel's performance. These were the eight factors:

4. Trial counsel, an Allegheny County Assistant Public Defender, testified at an evidentiary hearing that he was unaware of this Court's case law requiring a degree of guilt hearing;

5. Counsel conducted no investigation prior to the guilty plea;

6. Counsel retained no psychiatric expert before the guilty plea;

7. Counsel did not attempt to argue 2nd or 3rd degree murder although the record supports both;

8. Counsel left defendant alone in the bull pen to complete [the] guilty plea colloquy;

9. Counsel advised defendant to plead guilty to IDSI [involuntary deviate sexual intercourse] for which the Commonwealth now concedes there is no factual basis;

10. Counsel testified he had no training in capital cases;

11. Counsel testified he had no understanding of the concept of mitigation for sentencing purposes. . . .

*See* Reply Brief of Appellant (on direct appeal), at 7–8. After providing this list of trial counsel's deficiencies respecting the plea, direct appeal counsel pointedly concluded that, "A thorough and unvarnished analysis of the totality of the circumstances in this case should make this Court shudder at the cavalier approach to the death penalty taken by the lower court, the prosecution, and most unfortunately, **by defense counsel.**" *Id.* at 8 (emphasis added). In light of direct appeal counsel's efforts, I am unconvinced by appellant's current attack upon counsel respecting the voluntariness of appellant's guilty plea.

Mr. Justice Saylor's Dissenting Opinion notes that trial counsel's conduct was "troubling" as demonstrated by counsel's apparent decision to take the path of least resistance at various phases of the proceedings and the related observation that the Commonwealth has an obligation to provide an indigent capital defendant with essential resources necessary to his defense. I share these sentiments generally. However, in this case, we have the interposition of new appointed counsel on appeal, who litigated claims focusing upon trial counsel and, in my view, this must change the calculus. Many of appellant's positions here, forwarded by lawyers from the Philadelphia-based Federal Community Defender Office ("FCDO"), merely take claims identified and developed by appeal counsel and rejected by this Court, and spin off new theories of support or criticism. This all-out attack upon prior counsel is typical of the FCDO's litigation style in these many cases where they have involved themselves questionably in state-court capital litigation.

The alleged deficiencies of trial counsel seized upon by federal counsel here did not escape the notice of direct appeal counsel. Notably, in the direct appeal brief, counsel argued that trial counsel had abdicated his responsibility to meaningfully test the prosecution's case by advising appellant to plead guilty to first-degree murder; allowing a waiver of appellant's

right to a sentencing jury while failing to fully inform appellant of the ramifications; conducting no independent investigation into appellant's background for sentencing purposes; and moving into evidence the entire pre-sentence investigation report without limiting consideration of the highly prejudicial and inadmissible portions of the report. Indeed, counsel's direct appeal brief is not unlike the Dissenting Opinion, as appellate counsel pointedly asserted, "[i]n the most critical areas of this case, counsel acquiesced to the prosecution's legal theories.... Counsel's total capitulation caused him to take the bad with the good." *See* Brief of Appellant (on direct appeal), at 97–98.

Furthermore, appellate counsel also pointed out that in 1998 (after appellant's trial), Allegheny County was sued by indigent criminal defendants, alleging that severe understaffing, excessive caseloads, inadequate policies and procedures and other systemic deficiencies made it unlikely that the indigent could receive adequate Sixth Amendment representation. The lawsuit resulted in a settlement agreement, which was discussed by appellate counsel in her brief and was also the subject of extensive questioning of trial counsel during the evidentiary hearing. *See id.* at 98–99.[3] Appellate counsel also pointed to numerous changes that had taken place in the Allegheny County Public Defender's Office since the time of appellant's trial as proof of the deficiency in prior policies. *See* N.T., 6/27–28/2000, at 106–07. In short, the alleged

---

3. *See also* N.T., 6/27–28/2000, at 96 (trial counsel acknowledged that Allegheny Public Defender's Office did not have a policy to have every capital defendant examined prior to trial at time of appellant's trial, but policy had changed; trial counsel also acknowledged there were no minimum continuing legal education requirements regarding death penalty cases within office); *id.* at 97–98 (trial counsel acknowledged he had no specific training at his office regarding representation of death penalty clients prior to his representation of appellant, although situation had since changed); *id.* at 99 (trial counsel stated that appellant's case was his second death penalty case to go to trial and only one in which capital defendant had admitted to committing crime); *id.* at 99–100 (trial counsel testified that he was not assigned another lawyer to help him prepare case for trial); *id.* at 100 (trial counsel stated that position of mitigation expert "didn't exist" in office at time of appellant's trial); *id.* at 116 (trial counsel testified there were no funds to hire psychiatric expert).

failings of trial counsel's representation, both personal and systemic, did not escape the notice of appellate counsel; and in this case, at least, appellate counsel's performance must be accounted for when the underlying claim sounds in the deficiencies of trial counsel. To secure relief, appellant must prove that appellate counsel performed below constitutional standards. *See Smith v. Robbins*, 528 U.S. 259, 285–86, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Smith v. Murray*, 477 U.S. 527, 535–36, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). Furthermore, this Court considered appellant's claim that he was constructively denied counsel in violation of the Sixth Amendment, as outlined above, but rejected the claim, "[b]ecause we ha[d] determined that there were no errors warranting relief. . . ." *See Fears*, 836 A.2d at 74.

The gravamen of appellant's complaints concerning direct appeal counsel have more to do with his disagreement with the Court's decision on direct appeal, rather than with the actual performance of direct appeal counsel in forwarding those claims. On the Sixth Amendment claims as so forwarded on this appeal, I join the Majority Opinion.

## *DISSENTING OPINION*

Justice SAYLOR.

For purposes of the summary dismissal of Appellant's post-conviction claims, we are required to accept, as fact, the averments in trial counsel's declaration that: he lacked any training or experience whatsoever in capital litigation; he had no investigative resources available to him; and his caseload as a public defender interfered with his ability to prepare a defense, as reflected, *inter alia*, in his speaking with the government witness he selected to present in the defense penalty case for "a single time for less than ten minutes before calling her as a witness at [Appellant's] sentencing." Affidavit/Declaration of Trial Counsel at 1–3.

Consistent with the majority disposition of claims of deficient stewardship on direct appeal, the majority's present response to this disturbing state of affairs appears to accept that trial counsel made the best of a problematic situation.

*See, e.g.,* Majority Opinion, at 473, 86 A.3d at 811 ("Because the Public Defender's Office lacked funds for an expert, and trial counsel believed Dr. Martone would provide helpful expert testimony, we found he acted reasonably."). The State, however, has an obligation to provide an indigent capital defendant with essential resources necessary to his defense. Whether the responsibility for underrepresentation lies directly at the feet of the State or is attributable to errors or omissions on the part of the attorney the State has provided, the practical result to the indigent capital defendant will be the same: he will have been denied his constitutional right to an adequate defense.[1]

The averments of Appellant's PCRA petition and the accompanying proffers raise very serious questions in this regard,[2] as well as in terms of the derivative claims involving the stewardship of Appellant's counsel on direct appeal.[3] Thus,

1. It is particularly troubling to me that trial counsel's efforts, at each critical stage, appear to reflect the path of least resistance. He advocated a plea to first-degree murder (although he did not apprehend that prevailing law at the time did not recognize such a plea); he favored the waiver of Appellant's jury-trial right relative to penalty, thus foregoing the chance of gaining a life sentence by persuading only one of twelve jurors; without training or experience, counsel did so based on the dubious assumption that the trial judge would be impressed with Appellant's decision to plead guilty and/or the very mixed information deriving from a pre-sentence report (whereas, predictably, the court was not impressed); counsel did nothing to approximate a reasonable life-history and mental health investigation; and he did not so much as ask the trial court for funding to secure a mental-health evaluation of his client.

2. The abjectly deficient stewardship reflected on the face of trial counsel's declaration is consistent with a pattern of underrepresentation we are seeing in the Pennsylvania death-penalty cases. *See generally Commonwealth v. King*, 618 Pa. 405, 447–57, 57 A.3d 607, 633–39 (2012) (Saylor, J., concurring specially) (cataloguing anecdotal evidence of systemic deficiencies in the scheme of defense for indigent capital defendants). For this reason, as well, I favor close consideration of this type of case on a developed evidentiary record, consistent with my expressions in the past. *See, e.g., id.; Commonwealth v. Sneed*, 616 Pa. 1, 38, 45 A.3d 1096, 1118 (2012) (Saylor, J., dissenting) ("Given the extent of the patent ineffectiveness we have seen in a fair number of these cases, including this one relative to the penalty phase at least, I maintain that such claims should be decided on a reasonably developed record." (citation omitted)).

3. In terms of the representation provided by counsel on direct-appeal, the majority appears to fault Appellant for failing to provide an affidavit

the matter should be addressed on a developed post-conviction record, with Appellant being afforded the single post-conviction hearing to which he is entitled. *See* Pa.R.Crim.P. 909(B).

or declaration from his attorney explaining her strategy. *See* Majority Opinion at 480–81, 86 A.3d at 816. The majority otherwise appears to recognize, however, that such procedural omissions should not be relied in support of a summary dismissal, where the petitioner was not

afforded pre-dismissal notice of the asserted inadequacy. *See id.* at 462, 86 A.3d at 805.