**[J-61-2020] [OISA: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 781 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated May |
| | : | 16, 2019 in the Court of Common |
| | : | Pleas, Allegheny County, Criminal |
| v. | : | Division at Nos. CP-02-CR- |
| | : | 0008705-1994, CP-02-CR-009095- |
| | : | 1994 and CP-02-CR-0009201-1994. |
| LEROY FEARS, | : | |
| | : | SUBMITTED:  July 7, 2020 |
| Appellant | : | |

**OPINION IN SUPPORT OF REVERSAL**

**JUSTICE WECHT**                              `                              **DECIDED:  May 18, 2021**

The instant appeal arises from the dismissal of a serial petition filed by Leroy Fears under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541, *et seq.*, on February 8, 2016.  Therein, Fears asserted a claim of relief on federal due process principles based upon the revelation in 2015 of a trove of emails containing offensive stereotypes and slurs about homosexuals, African-Americans, and victims of domestic and sexual violence, that were connected to the private email account of former Pennsylvania Supreme Court Justice J. Michael Eakin.  Fears alleged that the content of those emails reflected an intolerable risk of judicial bias against groups with which Fears identifies, such that his due process rights were violated by Justice Eakin's participation in this Court's 2014 dismissal of Fears' previous collateral appeal.  *See Commonwealth v. Fears*, 86 A.3d 795, 802 (Pa. 2014) ("*Fears II*").  Fears requested discovery and an evidentiary hearing, which the PCRA court denied.  The court also denied relief on Fears' constitutional claim.

The Opinion in Support of Affirmance ("OISA") proffers alternative grounds for affirming the lower court's dismissal order. First, the OISA *sua sponte* reviews the timeliness of the petition, concluding that Fears failed to exercise due diligence in presenting his allegation of judicial bias. According to the OISA's own assessment, the facts upon which the claim was predicated were publicly available in October 2015, two months before Fears claimed to have discovered them, and, thus, could have (or should have) been discovered sooner. Consequently, the OISA finds that the PCRA court lacked jurisdiction to entertain the claim. Next, the OISA considers Fears' assertion that Justice Eakin's email practices demonstrated an unconstitutional risk of bias necessitating reconsideration of Fears' earlier claims in a new appeal before this Court untainted by Justice Eakin's alleged animus. The OISA dismisses this claim as meritless.

I would not reject either claim presently. Instead, because the PCRA court did not permit discovery or substantively address Fears' efforts to obtain the information upon which his claim is grounded, neither the due diligence issue nor the ultimate constitutional question regarding Justice Eakin's potential bias is capable of thorough resolution on the record before us. Accordingly, I would vacate the PCRA court's dismissal order and remand the case to that court for additional fact-finding.

## I. Procedural History

On June 18, 1994, Leroy Fears molested twelve-year-old Shawn Hagan on the banks of the Monongahela River in Allegheny County. When Hagan threatened to tell his parents what had happened, Fears strangled Hagan to death. He then had anal intercourse with Hagan's body, tied a tire rim around Hagan's neck, and swam with the body out into the river until it sank below the surface. When Hagan's remains were

discovered days later, Fears confessed to the murder, took detectives to the crime scene, and provided a videotaped confession. *Commonwealth v. Fears*, 836 A.2d 52, 56-57 (Pa. 2003) ("*Fears I*").

After pleading guilty to first-degree murder and related charges, Fears was sentenced to death on February 7, 1995. He did not appeal. In January 1996, Fears, acting *pro se*, filed a petition for post-conviction relief, alleging that counsel had failed to file an appeal on his behalf. The Commonwealth agreed to the reinstatement of Fears' post-sentence motion and appellate rights, which the trial court granted in May 1999. Thereafter, the court denied relief in July 2001. This Court affirmed the judgment of sentence in a unanimous opinion on November 20, 2003.[1] *Id.* at 58, 74. The Supreme Court of the United States denied Fears' petition for a writ of certiorari on June 27, 2005. *Fears v. Pennsylvania*, 545 U.S. 1141 (2005).

Fears filed his first counseled PCRA petition in June 2006, in which he raised numerous challenges to the effectiveness of his trial and appellate counsel. Relevant here, Fears alleged that trial counsel was ineffective for failing to present mitigating evidence of, among other things, the sexual abuse Fears allegedly suffered during adolescence at the hands of his foster brothers and a male cousin, as well as a family history of mental illness, alcohol abuse, and sexual violence on his mother's side. He also included a derivative claim alleging that appellate counsel was ineffective for failing adequately to litigate the issue of trial counsel's stewardship on direct appeal.[2] As part

---

[1]     Justice Eakin joined the Court's opinion.

[2]     Ordinarily, defendants must wait until collateral review to raise claims of ineffective assistance of counsel. *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002). We departed from that general rule in Fears' direct appeal in 2003. We found consideration

of his evidentiary proffer in support of his claims, Fears presented the results of a comprehensive psychiatric evaluation performed on him and the resultant diagnosis of "major depressive disorder with psychotic features." *Fears II*, 86 A.3d at 813 (citing Decl. of Dr. Richard G. Dudley, 5/25/2006, at 1-2). During that evaluation, Dr. Dudley documented that Fears "was ashamed from the sexual abuse" that he experienced while in foster care and "also felt shame from feeling he was gay, which was exacerbated because the family's religious views condemned homosexuality." *Id.* (citing Dudley Decl. at 4). The PCRA court dismissed Fears' petition without an evidentiary hearing.

On February 19, 2014, this Court affirmed the PCRA court's denial of relief in an opinion authored by Justice Eakin. As to the mitigation issue, we observed that Fears' allegation "of trial counsel's ineffectiveness for failing to explore mitigating circumstances was developed by appellate counsel" on direct appeal and was rejected as meritless by this Court in 2003. *Id.* at 816. For those reasons, we dismissed Fears' derivative challenge to appellate counsel's purported "failure to properly litigate trial counsel's ineffectiveness." *Id.* at 817.

> Following our 2014 decision, an email scandal came to light as a result of
>
> an investigation by former Attorney General Kathleen Kane into her predecessor's handling of an unrelated matter. This investigation uncovered emails sent from and received by members of her office on Commonwealth owned computers that contained racist, sexist, misogynistic, homophobic, and religiously and ethnically insensitive content. Their piecemeal release revealed individuals from all three

---

of his challenge to trial counsel's stewardship to be "appropriate" at that time because "trial counsel had testified at an evidentiary hearing, and the trial court had addressed [Fears'] allegations in its opinion." *Fears II*, 86 A.3d at 802. Therefore, we "reviewed those [ineffectiveness] claims that were fully litigated below, and dismissed without prejudice those not ripe for review." *Id.* (citing *Fears I*, 836 A.2d at 59 & n.7, 69, 71).

branches of the Commonwealth's government as having sent and/or received these emails.

*Commonwealth v. Robinson*, 204 A.3d 326, 327 (Pa. 2018) (Opinion in Support of Reversal ("OISR")); *see also Commonwealth v. Blakeney*, 193 A.3d 350, 354-56 (Pa. 2018) (OISR).

As was thoroughly recounted in *Robinson* and *Blakeney*, the Attorney General's email investigation implicated two former members of this Court:  Justice Seamus McCaffery and Justice Eakin.  Details of Justice Eakin's involvement began to be released publicly in the fall of 2015.  On October 1, 2015, then-Attorney General Kane announced that she had turned over to the Judicial Conduct Board "more than 1,500" emails in the possession of the Attorney General's Office that Justice Eakin had received or sent, some of which involved "'racial, misogynistic pornography'" and "jokes" about domestic violence.[3]  The next day, the *Philadelphia Daily News*, a newspaper owned by the parent company of *The Philadelphia Inquirer*, revealed that it had obtained some of Justice Eakin's emails.  In describing their contents, the article noted generally that, "One mocks gay people.  Some make fun of Mexicans or African-Americans.  Some are pornographic.  Some make fun of women.  Some might just be considered juvenile."[4]

One week later, on October 8, 2015, the *Daily News* printed an extensive examination of the emails that it had obtained and reviewed.  Among the graphic

---

[3]    Craig R. McCoy, Angela Couloumbis, and Laura McCrystal, *Kane says Justice Eakin Exchanged Porn Emails on State Servers*, PHILA. INQUIRER (Oct. 1, 2015), https://www.inquirer.com/philly/news/politics/20151002_Kane_says_Justice_Eakin_exc hanged_porn_emails_on_state_servers.html.

[4]    William Bender, *New Emails Surface in Kathleen Kane Saga*, PHILA. DAILY NEWS (Oct. 2, 2015), https://www.inquirer.com/philly/news/20151002_New_emails_surface_in _Kathleen_Kane_saga.html.

descriptions of more than twenty individual emails, the article indicated that Justice Eakin had sent at least one email containing a "joke" about a woman who was beaten by her husband, and that he had received a number of emails containing "slurs about homosexuals" and "poking fun at Muslims" and African-Americans.[5] The article also detailed that Justice "Eakin's email address repeatedly appears within a network of law enforcement officials who received inappropriate emails on their government accounts," including the district attorney of Dauphin County; two judges on the Dauphin County Court of Common Pleas; the county's chief public defender; four assistant United States attorneys; a senior deputy Pennsylvania attorney general; a chief of police; a federal judge's deputy clerk; a top aide to former Governor Tom Corbett; a lawyer with the Pennsylvania Gaming Control Board; and an employee of the U.S. Fish and Wildlife Service, among others. The article was reprinted in the *Reading Eagle* the next day, and the emails were covered in varying degrees in numerous publications and television news stories throughout the Commonwealth in the ensuing weeks.[6]

On October 22, 2015, Attorney General Kane publicly released forty-eight emails that Justice Eakin sent or received between January 1, 2008, and December 31, 2012,

---

[5] William Bender, *A Supreme Court Justice's Indecent Inbox*, PHILA. DAILY NEWS (Oct. 8, 2015), https://www.inquirer.com/philly/news/20151008_A_Supreme_Court_justice_s_indecent_inbox.html.

[6] *See, e.g.*, Karen Langley, *Pa. Supreme Court Sends Review of Justice Eakin's Email to Conduct Board*, PITTSBURGH POST-GAZETTE (Nov. 2, 2015), https://www.post-gazette.com/news/state/2015/11/02/Pennsylvania-Supreme-Court-No-discipline-for-judge-Eakin-who-exchanged-offensive-emails-kane/stories/201511020136.

four of which originated from his private email account.[7] At that time, she described the tranche, which largely consisted of "images of topless and nude women as well as sexual jokes," as "only a subset of pornographic, misogynistic and racist emails received and sent by Justice Eakin on his private email address."[8]

After reviewing the emails turned over by the Attorney General's Office, the Judicial Conduct Board filed a complaint against Justice Eakin on December 8, 2015, alleging violations of the Code of Judicial Conduct and Article V of the Pennsylvania Constitution arising from his email practices. The complaint included a survey of the emails sent by Justice Eakin to employees of the Attorney General's Office, along with those received by him from members of that office, between 2008 and 2014. In total, the complaint documented that Justice Eakin sent 157 emails and received 786. Compl. at 23, ¶¶56-64. Of the 157 emails sent by Justice Eakin, according to the complaint, "a number of these emails contained subject matter that involved nudity, gender stereotypes, and ethnic stereotypes." *Id.* at 25, ¶78. Included among the eighteen emails sent by Justice Eakin that were described in the complaint were the previously reported "joke" about a wife who was beaten by her husband, *id.* at 27-28, ¶78(h), and two "off color jokes"

---

[7]     The Attorney General's Office selected emails from these dates because they "corresponded to the dates of the Jerry Sandusky criminal investigation and prosecution by" that Office. Jud. Conduct Bd. Compl. ("Compl."), 12/8/2015, at 7 n.1.

[8]     Karen Langley, *Attorney General Kane Releases Justice's Emails*, PITTSBURGH POST-GAZETTE (Oct. 22, 2015); https://www.post-gazette.com/news/state/2015/10/22/ Attorney-General-Kathleen-Kane-s-office-to-release-emails-of-state-Supreme-Court-Justice-J-Michael-Eakin/stories/201510220178. The *Post-Gazette* article referred to the October 8 *Daily News* report. *See also* Staff & Wire Report, *Kathleen Kane Releases Emails from Supreme Court Justice's Private Account*, MORNING CALL (Oct. 22, 2015), https://www.mcall.com/news/pennsylvania/mc-pa-kathleen-kane-eakin-emails-1022-20151022-story.html.

regarding the biracial identities of professional golfer Tiger Woods and President Barack Obama.  *Id.* at 29-30, ¶78(m)-(n).

As for the 786 emails received by Justice Eakin, the complaint details seventy-nine of them, which included "pictures of nude women; sexually-suggestive themes; gender stereotypes; homophobic content; socioeconomic stereotypes; violence towards women; racial humor; ethnically-based humor; and stereotypes of religious groups."  *Id.* at 31, ¶80(a); 38, ¶81(a).  A number of these emails were described in the October 8, 2015 *Daily News* article.[9]

The Court of Judicial Discipline ("CJD") issued an interim suspension of Justice Eakin on December 22, 2015, barring him from his judicial and administrative duties until further order.[10]

Within two months of the publication of the complaint, Fears filed the instant PCRA petition, in which he asserted that this Court's denial of relief in his previous PCRA appeal was tainted by the involvement of Justice Eakin because he had "sent and/or received emails that showed a bias against persons of color and gay persons and victims of sexual

---

[9]     In comparing the *Daily News* article to the complaint, it is apparent that the article contains descriptions of several emails not included among those summarized by the Board.  Those include additional homophobic stereotypes "about homosexuals being promiscuous and unable to sit through a documentary because they are too busy performing oral sex"; "quips about . . . nuns' breasts"; and at least two images of women with references to alcohol.  *See* Bender, *supra* note 5.

[10]    Justice Eakin resigned from this Court on March 15, 2016.  On March 24, 2016, the CJD issued an opinion concluding that Justice Eakin had violated the Code of Judicial Ethics and the Pennsylvania Constitution.  *In re Eakin*, 150 A.3d 1042 (Pa. Ct. Jud. Disc. 2016) (*per curiam*).

abuse, domestic abuse and incest." PCRA Pet., 2/8/2016, at 1, ¶1.[11] Fears requested the appointment of counsel; discovery; "an evidentiary hearing on all claims involving disputed issues of fact"; and relief in the form of vacatur of his guilty plea and death sentence, a new trial or sentencing proceeding, the reopening of his post-conviction proceedings, and "such other and further relief as is just and necessary." *Id.* at 23.

Conceding the facial untimeliness of his petition—which he filed more than a decade after his judgment of sentence for first-degree murder and related crimes became final—Fears pleaded that he satisfied the newly-discovered facts exception to the PCRA's jurisdictional time-bar. To satisfy that exception, a petitioner must demonstrate that "the facts upon which the claim is predicated were unknown to the petitioner and could not be ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). In *Commonwealth v. Bennett*, 930 A.2d 1264 (Pa. 2007), we clarified that the timeliness exception for newly-discovered facts "does not require any merits analysis of the underlying claim." *Id.* at 1271. Rather, that exception has just two components that a petitioner must establish. He must allege and prove that: (1) "the *facts* upon which the claim was predicated were *unknown*"; and (2) that those facts "could not have been

---

[11] In his pleadings, Fears claimed that one of the emails Justice Eakin received "pertained directly to him." Mot. to File 2d Amend. PCRA Pet., 7/31/2018, at 4, ¶8.

> Presented in the form of a joke, the email entitled "Leroy's Hearing Problem" reads: "[L]eroy asks a preacher to pray for help with his hearing, the preacher prays and asks how his hearing is, and Leroy says, 'I don't know, Reverend, it ain't till next Wednesday.'"

PCRA Pet., 2/8/2016 at 18, ¶¶59-60. Calling the email "alarming" and "shocking" to him, Fears averred that it was intended "to make fun of an African-American man named 'Leroy,' who was preparing for an impending legal proceeding." *Id.* at 18, ¶60.

ascertained by the exercise of *due diligence.*" *Id.* at 1272 (emphasis in original). "If the petitioner alleges and proves these two components, then the PCRA court has jurisdiction over the claim under" Section 9545(b)(1)(ii). *Id.* Additionally, at the time that Fears filed his petition, the PCRA mandated that a petition invoking a time-bar exception be filed "within 60 days of the date the claim could have been presented." *Id.* § 9545(b)(2).[12]

In his petition, Fears pleaded generally that "the facts upon which the claim is predicated were unknown to [him] and could not have been ascertained by the exercise of due diligence until now." PCRA Pet., 2/8/2016, at 13, ¶49. He also averred that he filed his petition within "60 days of the Complaint being filed against Justice Eakin by the Court of Judicial Discipline; his public apology and admission of sending and receiving the emails and his temporary suspension pending trial." *Id.* Significantly, Fears said nothing substantive about his inability to discover the facts upon which his claim was predicated earlier with the exercise of due diligence.[13] He noted, however, that he filed his claim "at this time in an abundance of caution, and to avoid any statute of limitations defenses, based upon information currently available through publicly-available filings and proceedings with the Court of Judicial Discipline." *Id.* at 14, ¶51.

---

[12]    Because the sixtieth day following the publication of the Board's complaint on December 8, 2015, fell on a Saturday, Fears filed his petition on Monday, February 8, 2016, in accordance with 1 Pa.C.S. § 1908. The PCRA now requires that such petitions be filed within one year of the date that the claim could have been presented.

[13]    Fears also suggested that he "may also meet" the governmental interference exception to the time-bar "because neither the Attorney General, the Courts nor the prosecutor in [Fears'] case disclosed to [him] the existence or content of the emails in question." PCRA Pet., 2/8/2016, at 13, ¶50. Because the Commonwealth conceded the timeliness of Fears' petition, the PCRA court did not address this alternative exception.

Fears subsequently filed a number of amended petitions and miscellaneous documents purporting to supplement his initial submission, only one of which expanded upon his initial averments with regard to his due diligence.[14]  In his first amended petition, Fears suggested that the filing of the complaint on December 8, 2015, triggered the sixty-day clock for raising his claim because the "descriptions of the various emails . . . were introduced into the public" on that date.  1st Amend. PCRA Pet., 6/28/2018, at 17, ¶57.  Although Fears noted that "[t]he emails themselves were introduced as Exhibit 1 at the December 21, 2015 proceeding in the Court of Judicial Discipline," he conceded that the complaint "was the first publicly-available and reliable document" charging Justice Eakin with ethical violations and describing "in painstaking detail" the "racist, homophobic and otherwise inappropriate content" contained in the emails.  *Id.*  Fears also addressed his due diligence in slightly greater detail.  He explained that, before "the substance of the emails" was made public with the filing of the complaint, he "could not have accessed the emails because they were on the Office of the Attorney General's computer servers and initially gathered as part of a confidential investigation."  *Id.* at 18, ¶59.  He also averred that production of the emails by the Attorney General "was selective and calculatingly

---

[14]    The remaining filings largely raised new arguments regarding Justice McCaffery and the administration of the death penalty in Pennsylvania generally.  *See, e.g.*, Mot. for Leave of Court to File 2d Amendment to Initial PCRA Pet., 7/6/2015; Mot. for Leave of Court to File an Amendment – Through Incorporation by Reference – to Initial PCRA Pet. in Conjunction with PCRA Amendments I & II, 8/2/2018; Supp. to Pet. for Writ of *Habeas Corpus* and for Collateral Relief Pursuant to the PCRA, 8/17/2018; Mot. to File an Amendment to Initial PCRA Pet. and in Conjunction to PCRA Amendments I & II, 9/21/2018; Mem. of Law: Higher Court Decisions Recent Instruction Supporting Appellant's Judicial Biasness [*sic*] Claim, 10/16/2018.  I agree with the OISA that Fears is due no relief on these belated claims because his supplemental filings were not self-executing and he did not obtain leave of court to amend his petition in order to raise them.  OISA at 22-23.

timed." *Id.* Fears did not address how he came to learn about the complaint or his knowledge of the foregoing news reports.

The Commonwealth did not challenge the timeliness of Fears' petition. Perhaps in light of that concession, the PCRA court, without analysis, summarily concluded that the petition was "timely filed within the 60-day period following the discovery of the new facts." PCRA Ct. Op., 10/2/2019, at unpaginated 5. Nevertheless, the court dismissed Fears' petition, concluding that he did not satisfy the PCRA's substantive provision for relief based upon after-discovered evidence. *Id.* at unpaginated 5-8.

## II. Analysis

Presently, Fears challenges the PCRA court's failure to permit discovery, to hold an evidentiary hearing, and to grant relief on the substantive claim based upon the presence of judicial bias in the disposition of his earlier appeal.

## A. Timeliness

The OISA begins its review by *sua sponte* investigating the timeliness of Fears' petition, concluding that the petition "fails to present a 'fact' that meets the jurisdictional requirements of our PCRA statute, and fails to set forth any information regarding the statute's due diligence requirement." OISA at 12. I respectfully disagree with the OISA's timeliness analysis. Despite acknowledging that Fears is not required to "provide a nexus between the newly discovered fact and his conviction," *id.* at 13, the OISA effectively imposes a heightened nexus requirement by engaging in a merits-based inquiry under the guise of a timeliness analysis. The OISA shows its hand by relying upon an apparent distinction between email senders and recipients posited by the Commonwealth in "a different portion [of its brief] than that addressing timeliness" in order to refute Fears'

satisfaction of the time-bar exception. *See id.* at 13-14. For support, the OISA identifies sources cited by Fears indicating that "Justice Eakin did not send any emails implicating the topics alleged by [Fears], and received only a few emails invoking the invidious subject matter." *Id.* at 14. The OISA's focus is misplaced.

Setting aside for the moment the question of whether a fact was unknown to the petitioner, *Bennett* requires a simple series of inquiries when presented with a PCRA petition invoking the newly-discovered fact exception: What is the fact? What is the claim? Is the claim predicated on the fact? Here, the answer to these questions is straightforward. The revelation of a trove of emails in the fall of 2015 indicating potential judicial bias on Justice Eakin's behalf against, *inter alia*, homosexuals, African-Americans, and victims of domestic and sexual violence, plus the claim that said bias violated Fears' constitutional right to due process of law by tainting review of his previous appeal, equals a claim predicated upon a fact. For present purposes, then, the identities of the senders and recipients of particular emails, and whether those emails in fact betrayed biases that could have tainted prior proceedings, are irrelevant at this stage. Those are issues germane to the substantive merits-based claim, not to the timeliness inquiry. What matters first is that, before October 2015, no one other than Justice Eakin and the network of individuals with whom he exchanged emails knew of the offensive subject matter being shared between Pennsylvania prosecutors and a member of the Commonwealth's highest court.

Contrary to the OISA's view, it is not the case that "the unsavory nature of Eakin's email account *per se* establishes" Fears' underlying claim. *Id.* Rather, it is the *specific* content of those emails—homophobic slurs, racist tropes, and callous disregard for abuse

victims—that suggests a bias against particular groups with which Fears identifies. When members of the judiciary hold those potential biases, the due process rights of the criminal defendants whose convictions those jurists review are implicated. Likewise, when those prejudices casually are shared with the very prosecutors who are charged with defending those convictions, the public's trust in the criminal justice system is unquestionably shaken. *See In re Glancey*, 527 A.2d 997, 999 (Pa. 1987) ("Public confidence is eroded by irresponsible or improper conduct by judges.") (citation omitted). Again, though, recognizing these points merely informs an analysis of the merits of Fears' underlying claim, rather than the timeliness of his petition. Shorn of its improper considerations, the OISA's inquiry can reach no other conclusion than that Fears raised a colorable constitutional challenge of judicial bias (or the appearance thereof) predicated upon a fact—*i.e.*, the revelation of "offensive emails displaying cultural biases which implicate his case," OISA at 13 n.11—that came to light in 2015. In doing so, he has satisfied his burden of proof as to these preliminary matters.

That leaves one important question: Was the fact of Justice Eakin's "indecent inbox," upon which Fears' claim of judicial bias was predicated, *unknown to Fears* within sixty days of when he filed his petition? Fears asserted that it was, at least in the most general of terms. *See* PCRA Pet., 2/8/2016, at 13, ¶49. In previous appeals raising similar claims, members of this Court, including this author, concluded that the facts upon which claims of judicial bias against Justice Eakin were predicated were made public as early as October 8, 2015, when the *Daily News* published its detailed examination of

Justice Eakin's email practices.[15]  That article, which subsequently was reprinted in other publications throughout the Commonwealth, expressly indicated that Justice Eakin's emails contained homophobic slurs, racist stereotypes about African-Americans, and commentary demeaning to victims of sexual abuse and domestic violence—the very prejudices that Fears alleges tainted review of his previous appeal.  In fact, the *Daily News* article provided more specific details about emails denigrating the first of these groups than were later contained in the disciplinary complaint filed against Justice Eakin by the Judicial Conduct Board.  *See supra* note 9.  Given the extensive public reporting about the emails' alarming subject matter, the "facts" contained in the complaint were not unknown when the complaint was filed—at least not to the public.  Therein lies the rub.

At the time Fears filed his petition, this Court continued to recognize the so-called "public records presumption," pursuant to which PCRA petitioners were precluded from

---

[15]     *See Robinson*, 204 A.3d at 342 (OISR) ("[A]lthough there was some publicly available information about Eakin's involvement in the email scandal in 2014, those news articles did not contain the facts upon which the claim raised in Robinson's third PCRA petition is predicated.  Those facts were not knowable or made public until October 8, 2015, when the information concerning Eakin's sending and receiving of offensive emails became publicly available. . . .  Not until the release of these newly disclosed emails did the 'fact' of Eakin's active participation in the transmission of offensive emails become known."); *id.* at 344 ("[T]he facts underlying Robinson's claim could not have been discovered through the exercise of due diligence until October 8, 2015."); *Blakeney*, 193 A.3d at 361 (OISR) ("The fact upon which the claim [of judicial bias] is predicated is the group of emails, and the bias of Justice Eakin that they suggest.  With the publication of the newspaper reports, Blakeney, an African-American and a Muslim, learned that a member of this Court had exchanged emails denigrating African-Americans and Muslims."); *id.* at 362 ("Blakeney could not, by the exercise of due diligence, have ascertained that Justice Eakin sent and received offensive emails.  This fact was not made public until the *Inquirer* and *Eagle* articles. . . .  [T]he existence of the offensive emails, the content of which was revealed to the public with the publication of the newspaper reports and which serve as the factual predicate for Blakeney's underlying claim, satisfies the exception for newly discovered facts."); *accord Commonwealth v. Koehler*, 229 A.3d 915, 923 (Pa. 2020).

asserting that matters of public record were unknown to them when attempting to satisfy the newly-discovered facts exception.[16] Although we narrowed the presumption's applicability in *Commonwealth v. Burton*, 158 A.3d 618 (Pa. 2017), by holding that it did not apply to "*pro se* prisoner petitioners," *id.* at 690-91, that decision would have afforded no benefit to Fears, who, by his own admission, has been represented by attorneys with the capital *habeas* unit of the Federal Public Defender's Office for the Western District of Pennsylvania since at least July 2014. *See* PCRA Pet., 2/8/2016, at 10, ¶40. Accordingly, Fears wisely focused upon the time that the facts giving rise to his claim entered the "public domain." *See* 1st Amend. PCRA Pet., 6/28/2018, at 17, ¶57 (citing *Commonwealth v. Edmiston*, 65 A.3d 339, 352 (Pa. 2013)). As noted, that occurred on October 8, 2015, four months before Fears filed his petition, a fact that both the Commonwealth and the PCRA court misapprehended in conceding its timeliness.

Although the OISA disclaims reliance upon the public records presumption, OISA at 16 n.12, it implicitly resorts to that now-defunct presupposition when it invokes the "publicly available" nature of the information in order to probe purported deficiencies in Fears' PCRA petition. *See id.* at 15-16. As with the unknown fact issue, the OISA identifies a pleading gap in Fears' filings relating to his due diligence obligations that also turns upon the presumption. The PCRA requires petitioners who invoke the newly-discovered facts exception to allege and prove that "the facts upon which the claim is predicated were unknown to the petitioner *and could not have been ascertained by the exercise of due diligence.*" 42 Pa.C.S. § 9545(b)(1)(ii) (emphasis added). The OISA

---

[16] *See, e.g.*, *Commonwealth v. Taylor*, 67 A.3d 1245, 1248 (Pa. 2013); *Commonwealth v. Chester*, 895 A.2d 520, 523 (Pa. 2006); *Commonwealth v. Whitney*, 817 A.2d 473, 478 (Pa. 2003); *Commonwealth v. Lark*, 746 A.2d 585, 588 n.4 (Pa. 2000).

observes that Fears did not "explain in his petition how or when he became aware of" the information contained in the December 8, 2015 complaint, or how he was able to discover that obscure filing but none of the earlier public reporting on the subject. OISA at 16. In doing so, the OISA necessarily leans heavily upon the public records presumption in concluding that Fears could have discovered that reporting two months earlier with the exercise of due diligence. *See id.* at 15-16 ("[T]he information upon which [Fears'] claims are predicated *was ascertainable* upon the exercise of due diligence nearly two months before, or when the Philadelphia Inquirer article was first published on October 8, 2015. . . . [Fears] at this point had reason to question the propriety of his case *in light of publicly available information*.") (emphasis added).[17]

Unlike the OISA, I would not hold the public reporting of Justice Eakin's email practices against Fears without first ordering additional fact-finding pertaining to his knowledge and diligence (or lack thereof). Significantly, we abolished the public records presumption during the pendency of Fears' appeal to this Court. *See Commonwealth v. Small*, 238 A.3d 1267 (Pa. 2020). In *Small*, we confronted the dichotomy left in *Burton*'s wake, whereby those defendants who retained counsel while incarcerated were presumed to be aware of facts in the public domain, while those without counsel were not. We acknowledged that "the plain language of the newly discovered fact exception does not call for any assessment of whether the asserted facts appear in the public record." *Id.* at 1283. Instead, the statute "plainly calls for a circumstance-dependent analysis of the petitioner's knowledge, not that of the public at large." *Id.* (citing *Burton*, 158 A.3d at 632 ("In requiring that the facts be *unknown to the petitioner*, the statute itself

_____

[17]    The OISA does not suggest *how* that information was ascertainable by Fears.

contains no exception, express *or* constructive, regarding information that is of public record.")). Having acknowledged and corrected our own mistaken precedent, we restored "the primacy of the statutory language" from which we departed two decades earlier. *Id.* Courts no longer can presume that incarcerated defendants could have discovered publicly available information with the exercise of due diligence, whether or not they had the benefit of legal representation.

It is solely within our power to ensure that the dead hand of a legal error propagated by this Court, once corrected, no longer burdens petitioners by strangling their otherwise viable claims from beyond the grave. *See id.* at 1284 ("[O]ur duty is not to streamline the process of denying potentially meritorious claims."). The public records presumption was purely of extra-textual judicial provenance. We engrafted it onto the PCRA, notwithstanding the statute's plain language, "in a single footnote and with little accompanying analysis." *Id.* at 1290 (Dougherty, J., concurring and dissenting) (citing *Lark*, 746 A.2d at 588 n.4). It applied exclusively in the context of post-conviction collateral challenges. Even then, in its last gasps it affected only a narrow class of incarcerated defendants who invoked the specific time-bar exception at issue here based upon facts that came into the public domain while those defendants were represented by counsel. Given the constrained parameters within which the presumption operated, those petitioners whose cases were awaiting disposition when *Small* was decided ought to benefit from its abolishment.

In his petition, Fears pleaded that the fact of Justice Eakin's email practices was unknown to him and undiscoverable with the exercise of due diligence before the Judicial Conduct Board filed its complaint on December 8, 2015. That pleading could have been

contested by the Commonwealth or probed by the PCRA court. It was not. Although the OISA is on firm ground in questioning the timeliness of a PCRA petition for the first time on appeal, *see Commonwealth v. Reid*, 235 A.3d 1124, 1143 (Pa. 2020), this Court should proceed cautiously before attempting to resolve fact-intensive issues left unaddressed by the PCRA court. Here, Fears has been afforded no opportunity to respond to the OISA's *sua sponte* inquest or to supplement the record regarding his knowledge and diligence, which were not challenged below. This Court has no inherent insight into the degree of public information available to a given prisoner, which may vary by prison, let alone one contending with the restrictions placed upon a capital defendant. Absent additional fact-finding, we have no way of determining whether, or how, Fears could have discovered the *Daily News* article or the reporting that followed.[18] Questions about Fears' knowledge and capacity to ascertain information in the public domain should be addressed in the first instance by the PCRA court sitting as fact-finder. Accordingly, I

_____

[18] The OISA would have Fears proactively deny his awareness of these news reports in order to satisfy his burden of proving the undiscoverability of the "publicly available" information pertinent to his claims, notwithstanding the fact that the very existence of those reports may have been unknown to him when he filed his petition. Had the Board cited that reporting in its complaint, those references might have sufficed to put Fears on notice that some of the information upon which he relied was available through other sources, thus prompting him to plead more precisely that he could not have obtained those particular articles with the exercise of due diligence. But the complaint cites none of the public reporting the knowledge of which the OISA now admonishes Fears for failing to disavow. Hence, Fears pleaded that he first learned of Justice Eakin's email practices on or about December 8, 2015, after the Board's complaint became public, and that he could not have discovered the information contained therein sooner with any degree of diligence. Based upon those assertions, it is unclear what more information "of the right kind" Fears could have included in his petition to meet his pleading obligations. OISA at 16 n.12. The PCRA does not require petitioners to be clairvoyant. In any event, under these circumstances, the proper venue for testing one's due diligence, which the Commonwealth opted not to do here, is an evidentiary hearing in the trial court.

would remand this matter to the PCRA court to consider whether Fears was duly diligent in raising his claim in light of the information regarding Justice Eakin's emails that was in the public record as of October 8, 2015.[19]

### B. Merits

Given my proposed disposition, I would not reach the merits of Fears' underlying claim of judicial bias. However, because the OISA ventures to resolve that question against Fears, the deficiencies in its analysis warrant delineation. Despite the absence of a complete record, the OISA draws sweeping conclusions based upon the descriptions of a smattering of emails in the Judicial Conduct Board's possession. The OISA proclaims that "Justice Eakin's email account and the content contained therein does not render him a biased jurist"; that "[h]is participation in the inappropriate email activity had no bearing on his ability to fairly apply the law to the facts of [Fears'] case"; and that "none of Justice Eakin's written opinions contained any bias, and certainly none that reached the levels of constitutional interference." OISA at 22. With these bare threads, the OISA endeavors to weave a narrative that absolves Justice Eakin from any further examination of his questionable email practices. The errors of this approach readily are apparent.

As a threshold matter, the PCRA's after-discovered evidence rule is not the correct analytical framework to address allegations of an appellate jurist's bias. That provision entitles a petitioner to relief upon requisite proof that his "conviction or sentence resulted from . . . [t]he unavailability at the time of trial of exculpatory evidence that has

---

[19] The OISA does not address Fears' alternative ground for satisfying the PCRA's time-bar pursuant to Section 9545(b)(1)(i), *i.e.*, that his failure to raise his present claim earlier was the result of interference by government officials. *See* 1st Amend. PCRA Pet., 6/28/2018, at 17, ¶58. That allegation also demands additional scrutiny by the PCRA court.

subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S. § 9543(a)(2)(vi). Proof that an appellate jurist's apparent bias tainted review of a criminal appeal does not constitute evidence that would *exculpate* the defendant of his guilt. Nor is it clear how such proof would change the outcome of a trial, to say nothing of overcoming evidentiary rules governing relevance and admissibility. The PCRA court's analysis of Fears' claim as one of after-discovered evidence was, therefore, erroneous. The OISA's determination that the lower court "was correct in concluding that [Fears] did not demonstrate that the emails, or any alleged bias he purports they reflect, would have altered the outcome of his proceedings," OISA at 18, similarly misses the mark because it conflates Fears' burden to establish a risk of judicial bias with the inapposite standard of proof for after-discovered evidence claims.

Claims of judicial bias implicate Section 9543(a)(2)(i) of the PCRA, which concerns "violation[s] of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i). That is so because proof of judicial bias contravenes state and federal due process principles. *Williams v. Pennsylvania*, ___ U.S. ___, 136 S.Ct. 1899, 1905-06 (2016).

That said, the OISA nonetheless errs by attempting to view Fears' claim through the lens of the unique circumstances at issue in *Williams*. That decision turned upon the participation of former Chief Justice Ronald D. Castille in this Court's review of Terrance Williams' PCRA appeal. As the District Attorney of Philadelphia, former Chief Justice Castille had authorized his subordinates to pursue the death penalty at Williams' murder

trial. Thereafter, as a member of this Court, he declined to recuse himself from Williams' appeals. *Id.* at 1903-05. Reasoning that "there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case," the Supreme Court of the United States concluded that former Chief Justice Castille's recusal declination violated Williams' rights under the Fourteenth Amendment's Due Process Clause. *Id.* at 1905. The Court further clarified that, for appellate jurists, "an unconstitutional failure to recuse constitutes structural error even if the judge in question did not cast a deciding vote." *Id.* at 1909.

*Williams* thus offers a bright-line test for a unique category of due process claims: A judge may not sit in review of the convictions that he had a significant, personal role in securing as a prosecutor. To do so would constitute error *per se* and would necessitate a new appeal. Fears has never claimed that Justice Eakin had a significant, personal involvement in his case as a prosecutor. For that reason, his claim is not grounded in the rule announced in *Williams*. Although the *Williams* Court declared that the "'absence of actual bias' on the part of a judge" is a guarantee of due process, *id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)), the Court also reaffirmed the notion that the test for judicial bias in most other circumstances is an objective one. Faced with an allegation of bias such as the one Fears presents here, a reviewing court "asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id.* (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009)). Viewed objectively, a judge whose conduct suggests an impermissible potential

for bias for or against any party, whether due to pecuniary interests or other potential prejudices, must recuse from any case involving that party.

Following *Williams*, in *Commonwealth v. Koehler*, 229 A.3d 915 (Pa. 2020), we addressed whether "PCRA courts are vested with the authority to remedy appellate-level constitutional violations in the form of a new appeal to the appellate court, if warranted by the factual development of the case." *Id.* at 929. We held that "[a]n issue challenging the impartiality of an appellate judge . . . constitutionally relates directly to the validity of the decision upholding the underlying conviction and sentence. It is an attack upon the truth-determining process, a process that logically includes collateral attacks on the judgment of sentence." *Id.* at 931. "Consequently," we concluded that "a due process challenge to the impartiality of an appellate jurist is cognizable under Section 9543(a)(2)(i) of the PCRA." *Id.* We further held that "the remedy for demonstrating that an appellate tribunal included a jurist with an unconstitutional likelihood of bias would be a new appeal to that tribunal without the participation of the partial jurist." *Id.* at 933-34.

Like Fears, Koehler filed a facially untimely, serial PCRA petition asserting a due process challenge arising from Justice Eakin's participation in Koehler's previous collateral appeal. "Koehler asked for the opportunity to prove his due process violation and, if he prevailed on the merits, to obtain reinstatement of his PCRA appellate rights *nunc pro tunc*." *Id.* at 935. While we agreed with Koehler that the PCRA court mistakenly believed that it lacked the authority to grant the relief he requested, we declined to address his substantive claims in the absence of "the evidentiary and factual development that would be needed to substantiate a claim of appellate-level judicial bias." *Id.* at 937. We explained:

> This Court is not equipped to receive evidence, assess that evidence, or make credibility determinations. A claim of judicial bias may be supported, as it was in this instance, by requests for discovery, leave to amend the petition as the case develops, and requests for an evidentiary hearing to resolve disputed facts. We can expect that claims of judicial bias would require precisely the kind of factual development best suited to the courts of common pleas. . . .
>
> We are an appellate court. We require for our appellate review the development of a record as warranted and, where a hearing is appropriate, an assessment of the facts by the trial court hearing the evidence. . . .
>
> The proper forum to consider the allegations and evidence of judicial bias is the PCRA court. Once factual and evidentiary development occurs in that forum as needed, and the PCRA court makes its rulings, the appellate court can review those rulings on appeal in due course.

*Id.* Those observations apply with equal force here.

The OISA suggests that we "would be hard pressed to find any connection between the inappropriate and offensive subject matter and Justice Eakin's execution of his responsibilities as a member of this Court." OISA at 19. I disagree. Even a cursory review of the OISA's conclusions based upon the limited record before us confirms the need for additional fact-finding before the allegations lodged against Justice Eakin can be resolved one way or another.

Pertinently, the OISA relies upon a finding of the Court of Judicial Discipline that "there was no evidence that Justice Eakin 'in his written judicial opinions, ever demonstrated any overt bias due to the race, gender, ethnicity, or sexual orientation of a litigant or witness.'" *Id.* at 18 (quoting *Eakin*, 150 A.3d at 1048). The CJD's conclusion that the evidence it reviewed demonstrated no *overt bias* on Justice Eakin's part is of no moment. A sophisticated jurist (or even an unsophisticated one) who harbors prejudices against a particular group or individual is unlikely to air his animus openly, whether in legal opinions or via email, no matter how private or secure. That is why it is well-settled

that proof of a judge's actual bias is just one way to establish a due process violation. Appearances matter, too. In that regard, a reviewing court must be satisfied that a judge's conduct *objectively* does not give rise to an unconstitutional "potential for bias." *Caperton*, 556 U.S. at 881. Even the passive receipt over a period of years of homophobic and racist emails could suggest at least a tolerance for bigotry.

Furthermore, the CJD specifically found that the Judicial Conduct Board failed to produce evidence of overt bias. The only evidence of record reproduced in the appendices attached to the CJD's opinion was the descriptions of emails copied verbatim from the summary of the emails contained in the Board's complaint. But the Board's survey significantly was circumscribed. For instance, the Board limited its review to those emails that were in the possession of the Attorney General's Office between 2008 and 2014. *Accord Robinson*, 204 A.3d at 345 (OISR) ("The only emails sent or received by Eakin that have been disclosed to date are those that were housed on the OAG's server."). It also stipulated that it examined 943 emails sent or received by Justice Eakin despite Attorney General Kane's public pronouncement that more than 1,500 emails had been turned over for review.[20] Even then, only eighteen of the 157 emails that originated from Justice Eakin's account were described in the Board's complaint, amounting to approximately 11.5% of the total number of emails that he sent. Likewise, the complaint summarized just seventy-nine of the 786 emails received by the justice—barely 10%. *See* Compl. at 31, ¶80(a) (noting that the emails received by Justice Eakin "contain material including, *but not limited to*, the following") (emphasis added).

---

[20]     If the number of emails that the Attorney General referenced included duplicates, it is not apparent from the complaint or the CJD's factual findings.

While it is true that the "overwhelming majority" of emails turned over by the Attorney General's Office to the Judicial Conduct Board "were sent by others," OISA at 18, it is difficult to accept general characterizations of the emails' contents when so few actually were summarized or entered into evidence. Yet the CJD simply relied upon the Board's stipulated summary of the limited sample in rendering its judgment. Fears' efforts to prove his unique claim of judicial bias, through targeted discovery if necessary, should not be prejudiced by the CJD's reliance upon the Board's condensed review or the stipulation agreed to by Justice Eakin in lieu of a trial—negotiations to which Fears was not a party. Moreover, Justice Eakin's interest in agreeing to the Board's curated stipulation rather than having the totality of his emails entered into the public record could not be more apparent. As noted, a number of emails, at least one of which contained homophobic stereotypes, were identified in the *Daily News* article but did not appear to be described in the Board's complaint. With almost 90% of the total number of emails excluded by choice from the CJD's review, it is not farfetched to think that similar content so far has escaped public accounting. And it certainly is not so implausible that it justifies precluding Fears forever from examining the entirety of the collection of emails.[21]

---

[21]     Notwithstanding these concerns, the OISA steadfastly defends its reliance upon the Board's limited descriptions by noting that the Board "still examined the full panoply of emails and labeled them according to the invidious subject matter which each demonstrated." OISA at 19 n.16. Absent an independent review by the PCRA court of the emails in the Board's possession, how the Board chose to label the 846 emails that it did not describe in its complaint is *dehors* the record and meaningless for present purposes. The OISA effectively has taken judicial notice of Justice Eakin's apparent lack of bias without a single email in the Board's possession having been turned over for examination by a court *in these proceedings*. While that approach certainly makes for "efficient review," *id.*, any efficiency to be gained will come at Fears' expense.

As with the question of Fears' diligence, the issue of Justice Eakin's bias—or, rather, the objective risk of his bias emanating from his emails—cannot be determined without a more thorough examination of the messages that he sent or received. Moreover, it is noteworthy that both *Robinson* and *Blakeney*—which we affirmed not on their merits but as a consequence of this Court's even divide—involved *ex parte* communications between Justice Eakin and members of the Attorney General's Office and the Dauphin County District Attorney's Office. Because those offices prosecuted Robinson and Blakeney, respectively, the allegations raised in those cases suggested a distinct appearance of bias not immediately apparent here. Given the incomplete email summary produced by the Board, we are unable to determine whether there exist any emails between Justice Eakin and employees of the Allegheny County District Attorney's Office, which prosecuted Fears. If prosecutors in that office possessed additional evidence of communications with Justice Eakin containing homophobic slurs, racist stereotypes, and "jokes" about victims of domestic and sexual violence, those messages—and the threat of their revelation—could give rise to a potential risk of bias in favor of the Commonwealth's position in Fears' prior appeals similar to that alleged in *Robinson* and *Blakeney*.

In sum, Fears' claim of bias could be satisfied in at least two ways. The first turns on whether the sheer volume and content of emails sent or received by Justice Eakin reflect an objective risk of bias against homosexuals, African-Americans, or victims of abuse, the groups with which Fears identifies. That approach would require a full accounting of the trove of emails in the Board's possession. The second would depend upon whether Justice Eakin exchanged similar communications with Allegheny County

prosecutors that might indicate a bias in favor of that office in criminal matters in light of the reputational harms that could result from the public release of those messages. Additional disclosures and rigorous fact-finding by the PCRA court is necessary for a merits review of those claims. *Cf. Koehler*, 229 A.3d at 937. Where, as here, glaring evidence of suspect email practices already has been thrust into the public sphere, a third party's limited evaluation of that evidence will not suffice to satisfy the demands of discovery on collateral review. Because neither Fears nor this Court is privy to the full breadth of the emails at issue, we cannot fairly conduct a merits review of his claims on this record. For these reasons, I would remand for further proceedings consistent with this opinion.

Justice Donohue joins this Opinion in Support of Reversal.